506 F.2d 136
 1 ITRD 1549, 165 U.S.App.D.C. 75, 1974-2
Trade Cases 75,280
 CONSUMERS UNION OF U.S., INC.
v.
Henry A. KISSINGER, Secretary of State, et al., United
States SteelCorporation, Appellant.
CONSUMERS UNION OF U.S., INC.
v.
Henry A. KISSINGER, Secretary of State, and Julius L. Katz,
Deputy AssistantSecretary of State for Economic
Affairs, Appellants.
CONSUMERS UNION OF U.S., INC.
v.
Henry A. KISSINGER, Secretary of State, et al., American
Iron and SteelInstitute, Appellant.
CONSUMERS UNION OF U.S., INC., Appellant,
v.
Henry A. KISSINGER, Secretary of State, et al.
CONSUMERS UNION OF U.S., INC.
v.
Henry A. KISSINGER, Secretary of State, et al., British
Steel Corporation, Appellant.
CONSUMERS UNION OF U.S., INC.
v.
JAPAN IRON AND STEEL EXPORTERS ASSOCIATION and Nippon Steel
Corporation, Appellants.
CONSUMERS UNION OF U.S., INC.
v.
Henry A. KISSINGER, Secretary of State, et al., Fried, Krupp
Huettenwerke,A.G., Appellant.
 Nos. 73-1095 to 73-1097, 73-1132, 73-1133, 73-1135 and 73-1138.
 United States Court of Appeals, District of Columbia Circuit.
 Argued May 31, 1973.
Decided Oct. 11, 1974, Rehearing Denied Dec. 2, 1974.
 
 Abe Krash, Washington, D.C., with whom Jerome I. Chapman and David Bonderman, Washington D.C., were on the brief, for appellant in No. 73-1095.
 Irwin Goldbloom, Atty. Dept. of Justice, with whom Morton Hollander and David J. Anderson, Attys. Dept. of Justice J. Dapray Muir, Asst. Legal Adviser, Dept. of State, were on the brief for appellants in No. 73-1096.
 Lloyd N. Cutler, Washington, D.C., with whom Max O. Truitt, Jr., Daniel K. Mayers and Ronald J. Greene, Washington, D.C., were on the brief, for appellants in No. 73-1097, also argued for all other appellants.
 William B. Pennell, New York City, with whom Richard A. Whiting, Monroe Leigh, Daniel J. Plaine and Virginia M. Dondy, Washington, D.C., were on the brief, for appellant in No. 73-1133 also argued for appellants in No. 73-1135 and No. 73-1138.
 Steven Brodsky, Washington, D.C., with whom Richard A. Frank, Washington, D.C., was on the brief, for appellant in No. 73-1132 and appellee in Nos. 73-1095, 73-1096, 73-1097, 73-1133, 73-1135, and 73-1138.
 Noel Hemmendinger, Washington, D.C., and Isaac Shapiro, New York City, were on the brief for appellants in No. 73-1135.
 Milo G. Coerper, Washington, D.C., was on the brief for appellant in No. 73-1138.
 Shirley Z. Johnson, Washington, D.C., filed a brief on behalf of Philip A. Hart as amicus curiae urging affirmance.
 Before DANAHER, Senior Circuit Judge, and McGOWAN and LEVENTHAL, Circuit Judges.
 McGOWAN, Circuit Judge:
 
 
 1
 These consolidated cross-appeals are directed respectively to two declarations made by the District Court in a suit challenging efforts by the Executive Branch of the United States Government to bring about reductions in steel imports by means of self-imposed limitations on foreign producers. Arrayed against each other are a complaining consumers organization, on the one side, and, on the other, the State Department, and foreign and domestic steel producers, individually and in association. In the form eventually taken by the litigation in the District Court, we consider that the only question before us is whether the actions of the Executive were a regulation of foreign commerce foreclosed to it generally by Article I, Section 8, Clause 3 of the Constitution, and in particular by the Trade Expansion Act of 1962, 19 U.S.C. 1801 et seq. To the extent that the District Court declared no such conflict to exist, we affirm its decision.
 
 
 2
 * Steel imports into the United States increased more than tenfold over the period 1958-68, with the great bulk of imports coming from Japan and the countries of the European Communities.[1] The effect of this development on the domestic steel industry, which is deemed to be of great importance to the nation's security as well as to its peacetime economy, became a matter of widespread concern. In 1968 bills with substantial backing were introduced in Congress to impose mandatory import quotas on steel.
 
 
 3
 The Executive Branch regarded the problem created by steel imports as temporary in nature[2] and thus amenable to a short-term solution.[3] It concluded, moreover, that unilaterally imposed mandatory quotas would pose a danger of retaliation under the General Agreement on Trade and Tariffs, prove inflexible and difficult to terminate, and have a seriously adverse impact on the foreign relations of the United States. Import limiting agreements negotiated with other governments were likewise rejected on the State Department's advice that negotiated official restrictions, if achievable, would have political consequences for the foreign governments that would also affect our external affairs adversely. Accordingly, the Executive Branch concluded in 1968 that voluntary import restraint undertakings by foreign producers offered the best hope of alleviating the domestic industry's temporary problems at the least cost to United States foreign, economic and trade policies.
 
 
 4
 After an initial showing of interest by the foreign producer associations, State Department officials entered into discussions that lasted from June to December, 1968, and resulted in letters being sent to the Secretary in which the Japanese and European producer associations stated their intentions to limit steel shipments to the United States to specified maximum tonnages for each of the years 1969, 1970, and 1971.[4] During 1970, domestic industry and union representatives urged the State Department to seek renewal of the restraints beyond 1971 to provide greater time within which to achieve needed changes, and the House Ways and Means Committee issued a report to like effect. When various executive organs, such as the President's Council of Economic Advisors, had made the same recommendation, the President directed the Secretary to seek extensions of the limitation representations. Such extensions, covering 1972 through 1974, were forthcoming in letters dated early in May, 1972, and announced by the President on May 6.[5]
 
 
 5
 The two 1972 letters are substantially alike. Each states the signatories' intention to limit exports of steel products to the United States both in aggregate tonnage and, within such limits, in terms of product mix. Each represents that the signatories 'hold themselves (itself) ready to consult with representatives of the United States Government on any problem or question that may arise with respect to this voluntary restraint undertaking' and expect the United States Government so to hold itself ready.[6] In addition, each states that its undertaking is based on the assumptions that (1) the effect will not be to place the signatories at a disadvantage relative to each other, (2) the United States will take no unilateral actions to restrict exports by the signatories to the United States, and (3) the representations do not violate United States or international laws.
 
 II
 
 6
 The original complaint in this action contained two separate and distinct claims. They were respectively denominated 'FIRST CLAIM (Antitrust)' and 'SECOND CLAIM (Unlawful Action by State Department Officials)'. The first claim sought declaratory and injunctive relief with respect to what were said to be continuing violations of Section 1 of the Sherman Act, 15 U.S.C. 1. The court was asked to declare the 1972 letters of intent to be in violation of that statute, and to enjoin all of the named defendants from engaging in any act to effectuate the import reductions contemplated by those letters.
 
 
 7
 The second claim, as its title implies, sought relief only with respect to the State Department defendants, who were said to have violated the law by 'facilitating, bringing about and negotiating' the limitations set forth in the 1972 letters of intent without compliance with Section 301 or Section 352 of the Trade Expansion Act of 1962. The relief sought was a declaration that the 1972 export limitations are illegal, and an injunction addressed to all the defendants, prohibiting acts in furtherance of the arrangement.
 
 
 8
 After answers had been filed by some of the defendants and a motion to dismiss or alternatively for summary judgment had been made by the State Department defendants, the parties stipulated that the first claim in the complaint be dismissed with prejudice, and an amended complaint was filed. The violation of law alleged in the amended complaint was that the State Department officials had acted to regulate foreign commerce within the meaning of Article 1, Section 8, Clause 3 of the Constitution, and of the laws relating to the regulation of foreign trade set forth in Title 19 of the U.S.Code, including Sections 301 and 352 of the Trade Expansion Act of 1962. The foreign producer defendants were said to be violating the same laws to the extent that they took steps to effectuate the limitations sought by the defendant State Department officials acting in excess of their authority. The relief sought was a declaration that the actions of the State Department officials in seeking the export limitations were ultra vires, and an injunction against the defendants from furthering the 1972 letters of intent in any way.
 
 
 9
 Answers to the amended complaint were filed by certain of the defendants and others moved for summary judgment, as did the plaintiff. The matter came on for hearing in the District Court on the cross-motions for summary judgment. Its disposition was embodied in what is styled a 'Memorandum Opinion, Declaration and Order.' The court concluded its discussion of the issues by making two declarations. The first was that 'the Executive has no authority under the Constitution or acts of Congress to exempt the Voluntary Restraint Arrangements on Steel from the antitrust laws and that such arrangements are not exempt.' The second was that 'the Executive is not preempted and may enter into agreements or diplomatic arrangements with private foreign steel concerns so long as these undertakings do not violate legislation regulating foreign commerce, such as the Sherman Act, and that there is no requirement that all such undertakings be first processed under the Trade Expansion Act of 1962.'
 
 
 10
 The court then went on to say that, although the question of whether there was a violation of the Sherman Act was not before it by reason of the stipulated dismissal of the antitrust claim with prejudice, it was apparent to the court that 'very serious questions can and should be raised as to the legality of the arrangements under the (Sherman) Act'; and the parties were 'urged to reexamine their positions and premises in the light of this memorandum and the declarations made.' The court characterized injunctive relief as inappropriate, and denied the respective motions for summary judgment to the extent that they were 'inconsistent' with the declarations made by it. It concluded by saying that 'no further proceedings are required,' and 'no costs will be awarded.'
 
 
 11
 Appeals were filed by the State Department defendants and by the domestic and foreign producers. The plaintiff filed a cross-appeal 'insofar as any declaration, or ruling on the relief requested, has been decided adversely to the plaintiff.'
 
 III
 
 12
 A substantial portion of the briefs and argument before us has been devoted to the Sherman Act. The defendant-appellants are, not surprisingly, perturbed by some of the comments made by the District Court with respect to possible Sherman Act liability. Although the court stated in terms that, by reason of the stipulation of dismissal, 'the question of whether or not a violation of the Sherman Act is present is not before the Court to decide,' it did not leave the matter at that. One of its declarations is that the Executive has no authority to exempt from the antitrust laws the arrangements here involved, and 'that such arrangements are not exempt.'
 
 
 13
 Since there is nothing in the record that shows the Executive as purporting to grant such an exemption,[7] this observation by the court does not have the stature of a declaratory disposition of an actual controversy. The court's other comments in this connection are not couched in adjudicatory form, as indeed, so the court recognized, they could not be in the light of the abandonment by the plaintiff of its antitrust claim. With the declaration vacated, as we shall direct in our judgment, these expressions of the court's opinion are without judicial force or effect and are not appropriate for pursuit upon appeal.
 
 
 14
 We think that the Sherman Act issue, for all practical purposes, disappeared from this case when the plaintiff, for reasons best known to itself, stipulated its dismissal with prejudice. It is apparent from the face of the original complaint that the Sherman Act claim was originally conceived by the plaintiff as a vital aspect of its lawsuit. Its resolution would almost certainly have required the exploration by adversarial trial of a number of complex questions of fact and law, and the making of legal rulings in an area not distinguished for its simplicity. When the plaintiff, confronted by that formidable prospect, elected to abandon its antitrust claim, the Sherman Act could no longer play a significant part in this controversy, and we have no occasion to concern ourselves with the discussions by the parties of the precise reach of that statute.[8]
 
 IV
 
 15
 We turn, then, to the District Court's declaration that, in respect of the actions of the Executive culminating in the undertakings stated in the letters of intent, 'the Executive is not preempted . . . and that there is no requirement that all such undertakings be first processed under the Trade Expansion Act of 1962.' That statute, as its name suggests, had as its principal purpose the stimulation of the economic growth of the United States and the maintenance and enlargement of foreign markets for its products.[9]
 
 
 16
 This was to be achieved through trade agreements reached by the President with foreign countries. Title II of the Act provided that, for a period of five years (1962-67), the President was authorized to enter into such agreements whenever he determined that any existing tariff duties or other import restrictions of either the United States or any foreign country were unduly burdening and restricting the foreign trade of the United States. Upon reaching any such trade agreement, the President was delegated the unmistakably legislative power to modify or continue existing tariffs or other import restrictions, to continue existing duty-free or excise treatment, or to impose additional import restrictions, as he determined to be necessary or appropriate to the carrying out of the agreement. 19 U.S.C. 1821. In connection with the first two of these powers, the Tariff Commission was given an advisory function, which included public hearings; and public hearings were also directed to be held, by an agency designated by the President, in connection with any proposed trade agreement. 19 U.S.C. 1841, 1843.
 
 
 17
 Title III of the Trade Expansion Act of 1962, recognizing that domestic interests of various kinds may be adversely affected by concessions granted under trade agreements, authorizes the making of compensating adjustments of various kinds. Section 301 (19 U.S.C. 1901) provides that the Tariff Commission shall undertake investigations of injuries allegedly being done to domestic businesses or workers by such things as increased imports flowing from a trade agreement. After holding public hearings, the Tariff Commission shall make a report to the President. If it affirmatively finds injury to domestic industry, the President may under Section 351 increase or impose tariff duties or other import restrictions, 19 U.S.C. 1981, or alternatively he may under Section 352 negotiate agreements with foreign governments limiting the export from such countries to the United States of the article causing the injury. 19 U.S.C. 1981. If this latter option is taken, the Act provides that the President is authorized to issue regulations governing the entry or withdrawal from warehouse of the article covered by the agreement.
 
 
 18
 The foregoing description of the Trade Expansion Act of 1962 covers, among others, Sections 301 and 352. They are the only provisions expressly identified in the amended complaint as constituting the allegedly preemptive exercise by Congress of its constitutional power to regulate foreign commerce that, so it is said, forecloses the actions of the Executive challenged in this case. The description extends also to Sections 302 and 351, which are referred to in plaintiff-appellant Consumers Union's brief, as is also Section 232, 19 U.S.C. 1862. This last is the so-called national security clause which provides that the President shall not decrease or eliminate tariffs or other import restrictions if to do so would impair the national security. The Director of the Office of Emergency Planning is directed to investigate any situation where imports threaten to impair the national security; and if he finds such threat, and the President concurs, action shall be taken 'to adjust the imports' of the article in question, which means that the article may by regulation be excluded from entry or withdrawal from warehouse.[10]
 
 
 19
 What is clear from the foregoing is a purpose on the part of Congress to delegate legislative power to the President for use by him in certain defined circumstances and in furtherance of certain stated purposes. Without such a delegation, the President could not increase or decrease tariffs, issue commands to the customs service to refuse or delay entry of goods into the country, or impose mandatory import quotas.[11] To make use of such delegated power, the President would of course be required to proceed strictly in accordance with the procedures specified in the statutes conferring the delegation. Where, as here, he does not pretend to the possession of such power, no such conformity is required.
 
 
 20
 The steel import restraints do not purport to be enforceable, either as contracts or as governmental actions with the force of law; and the Executive has no sanctions to invoke in order to compel observance by the foreign producers of their self-denying representations. They are a statement of intent on the part of the foreign producer associations. The signatories' expectations, not unreasonably in light of the reception given their undertakings by the Executive, are that the Executive will consult with them over mutual concerns about the steel import situation, and that it will not have sudden recourse to the unilateral steps available to it under the Trade Expansion Act to impose legal restrictions on importation. The president is not bound in any way to refrain from taking such steps if he later deems them to be in the national interest, or if consultation proves unavailing to meet unforeseen difficulties; and certainly the Congress is not inhibited from enacting any legislation it desires to regulate by law the importation of steel.
 
 
 21
 The formality and specificity with which the undertakings are expressed does not alter their essentially precatory nature insofar as the Executive Branch is concerned. In effect the President has said that he will not initiate steps to limit steel imports by law if the volume of such imports remains within tolerable bounds. Communicating, through the Secretary of State, what levels he considers tolerable merely enables the foreign producers to conform their actions accordingly, and to avoid the risk of guessing at what is acceptable. Regardless of whether the producers run afoul of the antitrust laws in the manner of their response, nothing in the process leading up to the voluntary undertakings or the process of consultation under them differentiates what the Executive has done here from what all Presidents, and to a lesser extent all high executive officers, do when they admonish an industry with the express or implicit warning that action, within either their existing powers or enlarged powers to be sought, will be taken if a desired course is not followed voluntarily.
 
 
 22
 The question of congressional preemption is simply not pertinent to executive action of this sort. Congress acts by making laws binding, if valid, on their objects and the President, whose duty it is faithfully to execute the laws. From the comprehensive pattern of its legislation regulating trade and governing the circumstances under and procedures by which the President is authorized to act to limit imports, it appears quite likely that Congress has by statute occupied the field of enforceable import restrictions, if it did not, indeed, have exclusive possession thereof by the terms of Article I of the Constitution. There is no potential for conflict, however, between exclusive congressional regulation of foreign commerce-- regulation enforced ultimately by halting violative importations at the border-- and assurances of voluntary restraint given to the Executive. Nor is there any warrant for creating such a conflict by straining to endow the voluntary undertakings with legally binding effect, contrary to the manifest understanding of all concerned and, indeed, to the manner in which departures from them have been treated.[12]
 
 
 23
 In holding, as we do, that the District Court did not err in declining to characterize the conduct of the Executive here under attack as in conflict with the Trade Expansion Act of 1962, we are not to be understood as intimating any views as to the relationship of the Sherman Act to the events in issue here. The Sherman Act is not, as noted above, one of the regulatory statutes charged as preempting the field, and the question of its possible substantive applicability vanished from this case with the original complaint.
 
 
 24
 The declaration in the District Court's order with respect to antitrust exemption is vacated, and the declaratory aspect of that order is confined to the proposition that the State Department defendants were not precluded from following the course they did by anything in the Constitution or Title 19 of the U.S.Code. As so confined, the order appealed from is affirmed.
 
 
 25
 It is so ordered.
 
 DANAHER, Senior Circuit Judge (concurring):
 
 26
 Assuredly I join in Judge McGowan's excellent opinion. Pragmatic in the sense that it represents the view of a jurist skilled in law and state affairs, Judge McGowan's treatment does not ignore the background of the problem here posed nor does it fail to take account of the allegations of Consumers' amended complaint with its appended exhibits and the agreed statement of facts submitted in the District Court. I feel impelled to voice additional comment only in view of the approach offered in dissent by our respected colleague.
 
 
 27
 At the outset, Judge Leventhal correctly has stated that this case 'must be decided as if the complaint had never contained a claim under the antitrust laws'. The original complaint had indeed set up a purported antitrust predicate, but Consumers on the record caused that count to be dismissed 'with prejudice'.
 
 
 28
 Next, even were we to assume that the District Court had jurisdiction under the Federal Declaratory Judgments Act, it was 'under no compulsion to exercise that jurisdiction', Brillhart v. Excess Ins. Co., 316 U.S. 491, 494, 62 S.Ct. 1173, 1175, 86 L.Ed.2d 1620 (1942), citing Aetna Casualty Co. v. Quarles, 92 F.2d 321 (4 C.A. 1937) with Judge Parker's discussion at 325 which here we might profitably recall. For present purposes, we may pass that point for even though the antitrust claim had been dismissed, the District Judge declared that 'the Executive is not preempted and may enter into agreements or diplomatic arrangements with private foreign steel concerns . . .'. Consumers Union of U.S., Inc. v. Rogers, 352 F.Supp. 1319, 1323 (DDC1973). The District Judge explained that the Acts, such as those cited in the dissent, 'cannot be read as a congressional direction to the President prohibiting him from negotiating in any manner with private foreign companies as to commercial matters'. Id.
 
 
 29
 So we turn to the area urged in the dissent in rejection of the District Court's declaration and in the assertion that congressional authority is 'plenary'. We may join issue here.
 
 I.
 
 30
 Our dissenting colleague regards the arrangements with the foreign private concerns as 'solemn negotiated bilateral understandings'. The record shows that the private producers themselves limited their own exports. Our colleague sees the Executive in position to call upon nonjudicial exercises of power if the foreign producers violate the arrangements. He suggests, e.g., that there could be 'possibly a call to reduce assistance programs' to the country of a foreign producer. He ventures 'Suppose the President directed customs officials to deny entry to United States ports of commodities violating the undertaking.' None of these things happened.
 
 
 31
 Rather, the record shows, that during the years 1957 through 1968 there developed an unprecedented increase in steel imports, particularly from producers in Japan and European countries. Import tonnages of steel mill products in 1957 totaled 1,155,000 net tons which by 1968 had become 17,960,000 net tons. Bills were introduced in Congress directed toward the imposition of restraints and controls of steel imports, with the result that worriment overtook our own officials as well as representatives of foreign producers. A Japanese economic mission sent its chairman in March 1968 to discuss problems of the steel trade with the particular objective of avoidance of congressionally imposed limitations upon the entry of Japanese steel.
 
 
 32
 It is not to be doubted that importantly placed officials in our Executive departments were fully aware of our tariff laws and regulations and of the legislative restrictions upon Presidential action.
 
 
 33
 By May 1968 Department of State officials and European steel industry representatives had joined in discussions which went forward through June and July 1968. Perhaps it is not too much to 'suppose' (our colleague's word) that President Johnson said 'Why don't you get those people in here and see if you can reason together with them?'-- or words to that effect.
 
 
 34
 Before the undertakings by and among the foreign steel producing companies were activated, the Department of State sought and obtained the views of members of Congress, representatives of domestic steel producing interests, unions involved in the steel industry and others.
 
 II.
 
 35
 So successful were the original three-year programs, so happily without incident, that an extension for an additional three years went forward only to be challenged in this action.
 
 
 36
 In this great nation with its complex economy and its varying conflicts requiring judicious accommodation, flexibility in achieving desirable results is a constant imperative. Fairly we may say that here there had been no Presidential action, legislative in character, undercutting the congressional prerogatives deemed by the dissent to be 'plenary'. If it be a penchant of our press to coin applicable expressions, 'jawboning' could here be taken as apt and that is what happened, nothing else.[1]
 
 
 37
 Collaterally and obviously not here controlling, we might well today applaud exhortations by our officials to companies producing oil in the Middle East to reduce their charges and to increase their exports of oil to our power starved economy. We might take it to be desirable that coffee producing companies in nations such as Brazil and Colombia be induced by our officials not to exploit our dependence upon their product by the imposition of unreasonable and exorbitant charges for their coffee exports. Surely no formal trade agreement should be required to persuade companies to export to us the bauxite so essential to the continued maintenance of our aluminum industry.
 
 
 38
 Judge McGowan, it is submitted, succinctly and authoritatively has concluded that 'the State Department defendants were not precluded from following the course they did by anything in the Constitution or Title 19 of the U.S.Code'.
 
 LEVENTHAL, Circuit Judge (dissenting):
 
 39
 With all respect, I must record my disagreement with the ruling of the majority that the President had the authority to negotiate detailed arrangements with foreign steel producers to limit their shipments of products to the United States.
 
 
 40
 In my view, this case is controlled by Congress's exercise of its plenary authority over the regulation of foreign commerce through passage, over the past forty years, of legislation establishing a comprehensive scheme occupying the field of import restraints. While there is room for a role based on inherent authority of the executive, in this case the actions taken by the President are inconsistent, by fair implication, with the scheme Congress has provided. My point is not that the President has taken the kind of action that Congress had forbidden to the Executive. On the contrary, the statutes passed by Congress established a broad executive discretion, and with a subject like steel imports and the kind of expansive scope of the 'national security' provision (which emerged in the 1950's and now appears in 232 of the Trade Expansion Act of 1962) that permits a restriction of imports which threaten to impair the national security by weakening the internal economy, there is a likelihood that the President would have been able to make the findings required by that law. But Congress has made the exercise of executive authority over import restraints dependent on public ventilation of the issues and has prescribed a procedure with safeguards and right of comment by affected interests. The President has concededly not followed that procedure, and this course cannot stand consistently with the statutory pattern.
 
 
 41
 Recent events, notably those affecting currency exchange rates and prices and supplies of fuels, have dramatically changed the economic climate that sparked these trade arrangements. While the particular issue may be less pressing, there has been no dilution of the principle that the Executive cannot circumvent procedures delineated by Congress. That principle is paramount even though it may sometimes lead judges to particular results that are dubious pragmatically. Compare Wilderness Society v. Morton, 156 U.S.App.D.C. 121, 479 F.2d 842 (1973); Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827 (1972).
 
 
 42
 I am not persuaded by the majority's pronouncement that the statutes are not pertinent to the present case because the arrangements, incorporated in letters from foreign steel producers which describe themselves as 'voluntary restraint undertakings,' did not contemplate the mandate of judicial enforceability. These undertakings by the President and foreign steel producers were carefully structured in considerable detail, obviously after detailed consultation with American steel interests, without exposure to the kind of input by purchasers that would have been provided if the Congressional procedures had been followed. These undertakings are bilateral. and establish obligations. Their bite persists notwithstanding the majority's effort to coat them bland vanilla. The majority tolerates executive detours around the limits staked by Congress in the field it has occupied. Its concept that a different route is available for executive arrangements discerned as not intended for judicial enforcement is, in my view, unsound.
 
 I. THE 1972 LETTERS
 
 43
 The subject of this litigation is, specifically, the arrangements made in 1972 between the Executive and foreign steel producers. In early 1970, various steel industry and labor union representatives, still concerned about the effect of dramatically increased steel imports on domestic industry, urged the State Department to seek an extension of commitments that had been made for the years 1968 to 1971. Following a study by a special committee, the President, in December 1970, directed the Department of State to seek new pledges from the foreign producers. The State Department, according to the affidavit of a cognizant official, 'met with various domestic interests,' and 'received information and advice from diverse elements of the steel industry.' The affidavit goes on to say: 'The arrangements 'were entirely the result of negotiations between the foreign producer representatives and State Department officials who . . . spoke for and represented the policy judgments of the United States Government alone.'[1]
 
 
 44
 The 1972 arrangements were embodied in separate letters to the Secretary of State-- from the Japan Iron and Steel Exporters' Association, and from the steel producers of the European Economic Community, including the United Kingdom. The letters were released by the White House on May 6, 1972, along with a Statement by the President and a Fact Sheet. President Nixon characterized this 'welcome development' as the product of more than a year's effort by Deputy Under Secretary of State for Economic Affairs Nathaniel Samuels. The President's Statement announced that under the 1972 arrangements the foreign steel producers 'pledge a three-year restraint' on steel exports to the United States, and further stated that this undertaking 'represents a substantial improvement' over prior arrangements.
 
 
 45
 The arrangements set limitations on total amounts of steel mill products to be shipped to the United States in 1972-- 6.498 million short tons from Japan, and 8,013,794 short tons from the United Kingdom and European Community; and a limit of 2.5% Of growth increase in each of the following two years. There were also more specific and detailed arrangements, summarized as follows in the White House Fact Sheet:
 
 
 46
 'The provisions of the renewed undertakings also include a firmer understanding on product mix and geographic distribution, with specific tonnage limitations on each of the three categories of specialty steel-- stainless, tool and other alloys.'
 
 
 47
 Thus the limit on shipments of stainless steel mill products in 1972 was set at 16,873 metric tons for the steel producers of U.K. and EEC, and at 72,463 metric tons for the steel producers of Japan.
 
 
 48
 Each of the letters contained a paragraph on 'Consultations'-- which recorded the understanding that the producer associations 'hold themselves ready to consult with representatives of the United States Government . . . (and) expect that, similarly, the United States Government would be prepared to consult with their representatives on any problem or question that may arise with respect to this voluntary restraint undertaking.'[2]
 
 
 49
 Each letter stated that its 'voluntary restraint undertaking is based upon the following assumptions'-- (a) that the disadvantages imposed by the arrangements should be equalized for importing producers, (b) that the United States Government will take no unilateral action to restrict the quantity of steel imports, or to raise tariffs, or to impose supplemental duties on import of steel, and (c) that the undertaking is not in violation of 'any law of the United States or international rule.'
 
 
 50
 It is undisputed that the President, in negotiating these steel import limitations, did not act pursuant to any authority delegated by Congress. The State Department affidavit tendered by the defendants sets forth that Executive action under existing statutory authority was pondered and rejected.[3] Presidential imposition of import quotas is authorized under the 'escape clause' provisions of Title III of the Trade Expansion Act of 1962, 19 U.S.C. 1901, but only on a finding of injury caused in major part by 'concessions' granted under trade agreements; and the difficulties of the domestic steel industry were ascribed to excess capacity, superior technology, and a cheaper supply of labor available to foreign producers, rather than to concessions.
 
 
 51
 Under 232 of the Trade Expansion Act of 1962, 19 U.S.C. 1862, the President has authority to limit imports to protect the national security, but this authority was also eschewed, for the reason that national security was only one of several factors pointing toward import restrictions.
 
 
 52
 II. THESE ARRANGEMENTS ARE IN SUBSTANCE INTERNATIONAL AGREEMENTS NEGOTIATED BY THE PRESIDENT THAT EMBODY OBLIGATIONS AND MUST COMPLY WITH THE PROCEDURAL SAFEGUARDS PRESCRIBED BY CONGRESS AS A CONDITION OF EXECUTIVE RESTRAINTS ON IMPORTS
 
 
 53
 The contention, accepted by the majority, that the President's action is valid, notwithstanding its lack of statutory authorization, is based on two propositions: (1) the action is within the President's independent 'foreign affairs' power; and (2) the import restraint achieved as a result of the President's action is not pre-empted by the Congressional regulatory structure.
 
 
 54
 Though there is no specific Constitutional clause granting the President power to conduct foreign affairs, that power has long been recognized. See United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 320, 57 S.Ct. 216, 81 L.Ed.2d 255 (1936). The President's role in shaping foreign policy is rooted in and enhanced by his ability to communicate with foreign governments in the conduct of diplomacy. See L. Henkin, Foreign Affairs and the Constitution 47 (1972). Presumably, diplomacy ordinarily comprehends negotiation with officials of foreign governments, rather than direct negotiations with foreign firms as here, but I hesitate to suggest that this constitutes an absolute limitation on the President's authority. What has been called the 'foreign relations 'apparatus," Henkin, supra, at 46, gathers a variety of commercial information in foreign countries, and this function inevitably involves contact with foreign firms, whether or not their governments are a conduit for communication.
 
 
 55
 However, to say that executive communications with a foreign national are within the President's foreign affairs role only opens the door to analysis. Here the purpose of the communication was to manage commerce between the United States and the foreign producers involved-- a matter over which Congress has plenary power conferred by Article I, 8. While it would be too narrow a view of the executive function to say that foreign commercial relations are not a proper subject of executive communications with foreign entities, the executive cannot, through its communications, manage foreign commerce in a manner lying outside a comprehensive, regulatory scheme Congress has enacted pursuant to its Article I, 8 power. As Mr. Justice Jackson said in speaking of shared Congressional and executive powers:
 
 
 56
 When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter.
 
 
 57
 Youngstown Sheet & Tube Company v. Sawyer, 343 U.S. 579, 637, 72 S.Ct. 863, 871, 96 L.Ed. 1153 (1952) (concurring opinion).
 
 
 58
 The proper inquiry, then, is whether the executive action in obtaining the agreements for steel import restrictions comports with the Congressional program for foreign trade, or whether Congress, by occupation of the field of foreign import restraints, has precluded the President's taking action on an independent basis without complying with the standards and procedures provided by Congress as a condition of executive effectuation of import restraints.
 
 
 59
 The majority says that the steel import restraints are in harmony with the statutory program because they are not enforceable in courts of law; they are said to be mere precatory expressions which Congress never intended to circumscribe by the procedural requirements applicable to mandatory import controls.
 
 
 60
 This response presents an issue that focuses on the nature and effect of the undertakings before us. Turning first to effect, Presidents may engage in many activities that have a perceivable economic impact upon the volume of commodities imported. The effects vary in terms of their stability, their specificity, and their duration. At one pole would lie general Presidential exhortations-- say, to consumers to 'Buy American'-- or general alarms, announcing that protective legislation will be sought if imports are not contained. Such appeals are valid even though they may have the effect of inhibiting some market behavior, and no one would view them as prohibited by even the strongest Congressional 'free trade' legislation. At the other extreme is a Presidential proclamation that foreign-trade commodities will not be allowed to enter, which plainly cannot be reconciled with the existing statutory structure, or legitimated by reference to some aura of 'inherent' Presidential authority. In between is a continuum of restrictions. In my view, the comprehensive statutory program constrains some but not all of the activities in this continuum. Here, the undertakings have an economic effect that parallels that of import quotas proclaimed by the President.
 
 
 61
 Turning to its nature, the Presidential action here goes far beyond a speech of announcement-- even one preceded by 'feelers' to foreign governments to ascertain how much they will tolerate. Far from being mere expressions of desire and intent, these are solemn negotiated bilateral understandings.
 
 
 62
 The arrangements are not unilateral announcements but the culmination of bilateral discussions that were not only participated in, but initiated by State Department officials. Although the final letters that embody the specific limitations are astutely couched in a litany of a 'voluntary restraint undertaking' on the part of the foreign steel producers, the circumstances are instinct with bilateral undertaking.
 
 
 63
 Obviously, foreign firms that have vigorously marketed their products in the United States do not voluntarily withhold production without some reciprocal aspect indicating that forbearance is to their advantage. Here, the undertakings of the foreign producers rest on Government assurances that disadvantages would be equalized among producers; that the United States Government-- or at least the not uninfluential Executive Branch-- would not take or start other measures to limit steel imports or increase duties; and that the transaction would not violate any law of the United States.[4]
 
 
 64
 The specificity of the limitations imposed by the undertakings[5] also indicates that they were the result of bilateral bargaining and agreement.
 
 
 65
 Significantly, by the terms of the arrangements, the parties contemplate continuing consultations. The foreign steel producers 'hold themselves ready to consult' on any question that may arise on the interpretation of their 'undertaking.' Does one accompany a unilateral declaration of intent with an offer to 'consult' about what he has declared? When the foreign producers go on to say that their undertakings are based on their expectation that the United States Government will consult with them on questions that arise, and the White House releases these letters, along with a detailed Fact Sheet, as a 'welcome development' that is the product of Executive negotiation can it be meaningfully denied that there is a reciprocal undertaking by the United States Government to engage in consultations with the producers?
 
 
 66
 The inference of bilateral undertaking is strengthened when the arrangement is placed in the context of historical practice. Export forbearance by foreign producers has historically been obtained by diplomatic exchange of notes between the United States and foreign governments. The diplomatic notes themselves have referred to an 'agreement' or gentlemen's agreement' to limit shipments.[6]
 
 
 67
 International agreements are not limited to those embodied in formal documents, authenticated with ceremony, but include, as here, the specifying of an arrangement, together with mutual assurances and understandings as to how all parties will behave in response. To cast the steel restraints as unilateral undertakings rather than as agreements is to exalt form over substance.
 
 
 68
 The majority asserts that, unlike agreements negotiated pursuant to statute, which may be enforced by executive regulations and ultimately by jidicial sanctions, the steel arrangements are unenforceable. But it is by no means clear that the Executive is without sanctions if the producers fail to abide by the arrangements. The very specificity of the limitations described by the letters makes violations easy to detect and the arrangements easy to enforce. That the threat of sanctions may carry considerable weight is indicated by the cooperation of the Japanese producers in making compensatory adjustments when they exceeded the quota for 1969 established by the original agreement. The remedy was a reduction of the 1970 quota by the amount of the overshipment. See Fifteenth Annual Report of the President of the United States on the Trade Agreements Program 28 (1970). Similarly, when the Japanese producers exceeded their aggregate quotas for 1972, 'consultations' resulted in an agreement by the Japanese producers to charge the 1972 overshipments against 1973 quotas. See Seventeenth Annual Report of the President of the United States on the Trade Agreements Program 44 (1972).
 
 
 69
 If, as the Government argues, the President has inherent power to negotiate these and similar restraints, I fail to see why the courts would or should refrain from enforcement if sought. Products shipped to the United States in excess of the restraints might be denied entry, or domestic firms might be enjoined from handling them.
 
 
 70
 The common law of international agreements respects voluntary undertakings even in the absence of the 'consideration' that is required under historic Anglo-American common law for domestic agreements to be enforceable in most state courts. If there must be a diplomatic peppercorn, there is consideration in the fact that the undertakings by the producers were plainly not meant to be revocable at will, and were based on a United States Government undertaking for consultation in the event problems arose and for avoidance of unilateral action against imports and tariffs. As I earlier indicated, this undertaking was binding on the Government which released and thus acknowledged this aspect of the letter arrangements. Further, principles of promissory estoppel may bind the foreign parties, even in the absence of a finding of initial consideration, once the Executive has relied on their representation that they intend to abandon any right they may have had to exceed the stated limitations on imports-- as it has relied here by failing to take other steps to limit imports. See Dickerson v. Colgrove, 100 U.S. 578, 580, 25 L.Ed. 618 (1879); Casey v. Galli, 94 U.S. 673, 680, 24 L.Ed. 168 (1876); Goodman v. Dicker, 83 U.S.App.D.C. 353, 354, 169 F.2d 684, 685 (1948).
 
 
 71
 Even if judicial enforcement was not contemplated by the parties, the arrangements still embody a restraint. Trade agreements between foreign nations, and indeed many international agreements, may be 'enforceable' only in the sense that they depend for enforcement on 'good faith' performance by the parties. That does not make them any the less solemn agreements, that are both intended to affect the conduct of the parties and likely to have that result.
 
 
 72
 Moreover, the Executive may call on non-judicial resources if foreign producers violate the arrangements. Actions that would ordinarily be resisted as inconsistent with amicable relations, possibly a call to reduce assistance programs to the country in question, could hardly be assailed in the face of foreign producer bad faith.
 
 
 73
 A deliberate breach may well have an outcome intermediate between direct judicial enforcement and complete non-involvement on the part of the judiciary. Suppose the President directed customs officials to deny entry to United States ports of commodities violating the undertaking, and suppose such actions were sought to be enjoined. It seems to me entirely likely that the parties might have contemplated both this executive action, and the judicial consequence-- on the assumption that the negotiations were valid-- that the courts had no basis for holding the executive action invalid.[7]
 
 
 74
 What is the significance of the reiteration that these undertakings were 'voluntary' on the part of the foreign producers? It is commonplace for a businessman to decide 'voluntarily' that he will enter into an agreement, although the agreement, once entered into, has binding effect. The mandate may issue from a court of law or arbitration. But the obligations enforced in a court of commercial good faith and good will are as rigorous and insistent as a blackrobed judgment. Congress has expressly authorized negotiated limitations in the orderly marketing agreement provision, 352 of the Trade Expansion Act of 1962.[8] And the national security provision authorizes restrictions imposed by Presidential proclamation, which embraces the authority to arrange restraints to which foreign producers consent.[9]
 
 
 75
 In my view, the steel quotas before us present an import restraint having a composite characteristic, in terms of effect and nature, as to be subject to the procedures and requirements set forth in the Trade Expansion Act of 1962.
 
 
 76
 This is the critical question in the case-- where to draw the line. There is a continuum of restraints, as noted above. In my view, the critical distinction is between executive actions that rest wholly in the domain of appeals and exhortations, and executive actions that culminate in obligations. A good faith agreement with the kind of specificity present here puts an obligation on the foreign producer, in any realistic assessment. Accordingly, I think the executive negotiation and acceptance of these undertakings are activity in a field that has been preempted by Congress, and can only be engaged in by following the procedures set forth in the Congressional enactments.
 
 
 77
 There is only local color, no legal significance, in the fact that in this case the Chairmen of key House and Senate Committees concerned with regulation of international trade voiced their approval on the occasion of the White House announcement of the undertakings. The Government does not contend, and I do not see how it could rightfully contend, that such participation by particular Congressmen can invest the President with executive authority not otherwise possessed, or constitute a legally decisive definition of the demarcation between the zone that belongs to Congress as a whole and that which belong solely to the President.
 
 
 78
 I am unimpressed with defendants' citation of statements from the legislative history of various trade provisions[10] as indicating a legislative intent that agreements could be reached without prescribed procedures.
 
 
 79
 If the entire legislative history is appraised, weight must be given to the two occasions-- in the passage of the 1962 law, and again in 1971-- when Congress has declined to give the President authorization to impose import restraints without observing procedural requirements.[11] However, the legislative history, as conventionally ascertained, does not give an independent view of Congressional intent, and this must be discerned from basic analysis of the statutes passed by Congress. The deep-seated and comprehensive Congressional insistence on procedural safeguards can best be appreciated in the light of pertinent history.
 
 
 80
 III. COMPREHENSIVE ENACTMENTS OCCUPYING THE FIELD OF PRESIDENTIAL ACTIONS RESULTING IN OBLIGATORY IMPORTS RESTRAINTS
 
 
 81
 The ascertainment of pertinent legislative intent depends not only on express wording of the Trade Expansion Act of 1962, and specific notations in its immediate legislative history, but on its character as a culmination of comprehensive enactments on the subject of executive actions resulting in obligatory foreign trade restraints, including agreements by the executive regarding imports. The Congressional pattern makes clear that such executive action is tolerated only if it is accompanied and safeguarded by procedural protections that ensure a right of comment by those whose interests may be affected. This not only avoids the vice of complete secrecy within the Government, it also avoids the vice of cozy confidentiality, in which the public is informed only when the matter is a fait accompli.
 
 
 82
 1. General legislation on tariffs and trade agreements
 
 
 83
 A. The Tariff Act of 1930, 46 Stat. 590, enacted a comprehensive schedule of duties. It gave the President the power to adjust duties to equalize differences in costs of production between domestic and foreign firms-- but only after a Tariff Commission investigation and recommendation.[12] This indicates the Congressional practice of regarding the regulation of trade as its own province. Certain authority was passed to the President, but this was limited both in scope and procedurally. Certain factual findings must be made by an independent body before the Executive can act, even when its goal is the protection of domestic industry.
 
 
 84
 B. The 1934 amendments to the Tariff Act of 1930, 48 Stat. 943, delegated to the President a then-unprecedented authority to reduce tariff barriers through trade agreements with foreign governments 'whenever he finds as a fact that any existing duties or import restrictions of the United States or any foreign country are unduly burdening and restricting the foreign trade of the United States.' This authority was renewed some nine times and then set forth in the Trade Expansion Act of 1962.[13] It represents Congress's understanding that the Executive's power in regard to the negotiation of trade agreements derives from statutory authorization by Congress.
 
 
 85
 In drafting the 1962 Act Congress undertook a comprehensive review of the international trade program. Section 201(a)[14] authorized the President to enter into trade agreements with foreign countries and gave him not only the power to adjust tariffs, within the limits established by 201(b), but also the power to modify existing or impose additional non-tariff import restrictions, including quotas.[15] However, before entering into negotiations the President was required to publish a list of commodities which would be the subject of the proposed agreement.[16] On the basis of this list, the Tariff Commission was to conduct an investigation, including the holding of public hearings, and to advise the President of the 'probable economic effect of modifications.'[17] The President was also to seek advice from other executive departments.[18] Finally, the President was obliged to 'afford an opportunity for any interested person to present his views' by designating, if necessary, an additional agency or an intra-agency committee to hold public hearings.[19]
 
 
 86
 The President's general authority to enter into new trade agreements under 201 of the Trade Expansion Act expired in July, 1967, and has not been renewed. What has survived is the statute's pattern, that is, a legislative recognition of the need for specified regulatory capability in the President, coupled with procedural requirements of investigations and hearings.
 
 2. Specific import restrictions
 
 87
 Congress has itself established specific restrictions on the import of certain commodities.[20]
 
 
 88
 It has also delegated to the President discretionary authority to impose import restrictions on agricultural commodities[21] -- but only after notification by the Secretary of Agriculture that articles are being or are practically certain of being imported in such quantities as to 'render ineffective, or materially interfere with' agricultural price support programs, and only after a Tariff Commission investigation that includes hearings.
 
 
 89
 Section 204 of the Agricultural Act of 1956, 7 U.S.C. 1854, authorizes the President to negotiate agreements restricting the import of agricultural goods and textiles. Unlike prior authorizations of Presidential action, this section requires no procedures to be followed in its exercise. However, this feature, of lack of required procedures, is a signal departure from the pattern of trade legislation, as has been remarked by members of Congress and commentators,[22] and is limited to certain commodities.
 
 3. General import restrictions
 
 90
 Congress has passed not only legislation for specific commodities, but also general provisions available to the President in accomplishing restrictions on the import of any commodity. These provisions, however, retain procedural safeguards to ensure against Executive finalization of restraints in secrecy.
 
 
 91
 a. By proclamation under the escape clause.
 
 
 92
 Without reviewing in detail the origin of the escape clause in the 1934 legislation and the provision of requisite procedures in 7 of the Trade Agreements Extension Act of 1951, 65 Stat. 72, it is instructive to examine the structure of 301 of the Trade Expansion Act of 1962, 19 U.S.C. 1901, which is the current embodiment of this clause. Section 301(b) provides that the Tariff Commission, in certain circumstances, is to conduct an investigation to determine whether there exists or is threatened, 'serious injury' to domestic industry caused 'in major part' by trade agreement concessions. Section 301(e) provides that the Commission, if it makes such a determination, shall recommend a tariff increase or other import restriction 'which is necessary to prevent or remedy such injury.' The President may by proclamation increase or impose import restrictions under this clause, but only after he receives an 'affirmative finding' by the Commission. Section 351(a) of the Trade Expansion Act of 1962, 19 U.S.C. 1981(a).
 
 
 93
 b. Orderly marketing agreements.
 
 
 94
 Of particular pertinence is the alternative provision in 352 of the Trade Expansion Act.[23] It provides that the President-- after receiving the Tariff Commission's affirmative finding under 301(b), and in lieu of issuing a proclamation imposing duty or other import restriction under 351-- may 'negotiate international agreements with foreign countries limiting the export from such countries and the import into the United States of the article causing or threatening to cause serious injury to (a domestic) industry, whenever he determines that such action would be more appropriate to prevent or remedy serious injury to such industry than action under' 351(a)(1). Here again there is indication of Congressional authorization as underpinning for Executive power to negotiate trade agreements, including those restricting imports.
 
 
 95
 c. National security provision.
 
 
 96
 Another provision for import restrictions, applicable to any commodity, is the 'national security provision,' which originated in the 1950's[24] and was transposed into 232 of the Trade Expansion Act of 1962, 19 U.S.C. 1862.
 
 
 97
 The term 'national security' is given an expansive definition in 232(c) of the Act,[25] which provides in part:
 
 
 98
 In the administration of this section, the Director and the President shall further recognize the close relation of the economic welfare of the Nation to our national security, and shall take into consideration the impact of foreign competition on the economic welfare of individual domestic industries; and any substantial unemployment, decrease in revenues of government, loss of skills or investment, or other serious effects resulting from the displacement of any domestic products by excessive imports shall be considered, without excluding other factors, in determining whether such weakening of our internal economy may impair the national security.
 
 
 99
 The President may adjust imports under this provision, but only after the Director of the Office of Emergency Planning conducts an investigation and reports that continued importation of a commodity is a threat to national security. Section 232(d), 19 U.S.C. 1862(d), requires publication of a report of each investigation made by the Director and requires the Director to 'publish procedural regulations to give effect to the authority conferred on him by subsection (b).' These regulations were intended to provide for public hearings except where it would be impracticable or injurious to the national security to do so.[26]
 
 
 100
 Existing regulations of the Office of Emergency Planning provide that public notice of an investigation shall appear in the Federal Register unless 'contrary to the interests of national defense,' and that interested parties shall have an opportunity to make written presentations, to inspect the presentations filed by other parties, and to submit rebuttal presentations. The Director also must 'seek information or advice from appropriate Government departments and agencies' and may, 'when he deems it appropriate,' hold public hearings.[27]
 
 
 101
 The national security clause represents another Congressional action to authorize Executive adjustment of imports in times of domestic crisis, but, once again, the Executive is not permitted to act in secrecy, without regard to interests that might be adversely affected.
 
 
 102
 Congress has enacted a comprehensive statutory scheme that identifies the Executive's role in shaping the terms of foreign trade. In doing so Congress has followed a well-established practice of combining broad executive discretion with procedural protection for those who may be affected by its exercise.[28] The only exception-- in 7 U.S.C. 1854, which permits the President to negotiate import restrictions on textiles and agricultural products without mandatory procedural prerequisites-- proves the rule.
 
 
 103
 When the President's tariff adjustment authority, conferred by the Tariff Act of 1922, was challenged as an unconstitutional delegation of legislative power, the prerequisite of a Tariff Commission investigation and hearing was a prominent feature noted by the Supreme Court in its rejection of the challenge. See J. W. Hampton, Jr. & Company v. United States, 276 U.S. 394, 405, 48 S.Ct. 348, 72 L.Ed. 624 (1928).[29]
 
 
 104
 The procedures by which Congress has circumscribed executive power to shape the terms of foreign trade are no mere technicalities. While freeing the making of international trade policy from the encumbrances of the legislative process, Congress has sought to maintain public ventilation of the issues relevant to policy formation. To say, as the majority opinion does, that the steel arrangements worked out by the President fall within an inherent Presidential authority not preempted by Congress is to allow the circumvention of these procedural safeguards whenever that suits the Executive. If detailed letters of intent are no different from general appeals to industry, the President would be within his authority to enter into such letters-of-intent arrangements with all industry on every aspect of domestic, as well as foreign commerce. This is dangerous doctrine.
 
 
 105
 Whatever may be the President's prerogative when Congress has not spoken, it is untenable, in my view, to assert a continuing inherent Executive authority to negotiate import restraints outside and in disregard of a consistent and comprehensive Congressional pattern for protective procedures.
 
 IV. PRIOR EXECUTIVE PRACTICE
 
 106
 The Government and the foreign steel producers urge on the court that Presidents have long negotiated restraints similar to the steel quotas without specific statutory authority, and that this tradition validates the President's action here. An appeal to past executive practice is not without relevance, but it is not decisive[30] and often raises as many questions as it purports to answer.
 
 
 107
 So far as this case is concerned, it suffices to say that while defendants cite examples of import restraints, described more fully in the Appendix, they fail to present a history of import restraints consistently negotiated by the President without regard for the procedures established by Congress and so represented to the Congress.
 
 
 108
 In the seventeen Annual Reports on the Trade Agreements Program that the President has submitted to Congress every year since 1957, there is no indication that import limitations on foreign products were sought by the President of the United States acting outside statutory authority. The only exception is that of the steel import quotas involved in the case at bar, described in the reports of 1968 through 1971. Congress cannot fairly be said to have acquiesced in an executive practice perceivable only dimly if at all.
 
 
 109
 Some of the examples that the Government cites describe executive action colored with statutory authority. This characterization fairly describes the voluntary oil import program of 1957, the 1936 limitation on export of Canadian red cedar shingles, and six of the ten commodity limitations cited in Congressional testimony of Secretary of State Dulles.[31] Taken as a whole, the examples do not show that the President has consistently asserted an extrastatutory authority to regulate imports by agreements with foreign governments or firms.
 
 
 110
 Finally, all the import restraints cited by the defendants were obtained before the enactment of the Trade Expansion Act of 1962. When it enacted the Trade Expansion Act of 1962, Congress had an opportunity to review all of the President's power to regulate imports. In my view, the Act has scope as a Congressional preemption which 'occupies the field' of import restrictions. This approach is heightened by the fact the 1962 Act included authority under 201 that was expressly limited to run to June 30, 1967. Congress deliberately contracted Presidential latitude by permitting the expiration of that authority, as of July 1, 1967, notwithstanding Executive requests for extension.
 
 V. DISPOSITION
 
 111
 This case must be decided as if the complaint had never contained a claim under the antitrust laws. However, in considering whether this is a claim on which relief may be given, I would take into account that relief in adjudicating invalidity may be wrought so as not to engender injustice in any future claim under the antitrust laws based on the conduct of the foreign producers. Any defense foreign producers might raise in future actions of reliance upon authoritative representations by government officials that an executive participation in the arrangement insulated them from antitrust liability would be undercut by a conclusion that executive participation is not authorized.
 
 
 112
 When a court is asked for a declaratory judgment-- here that executive action restricting steel imports is invalid-- it may act on the basis of equitable principles, and may respond to broad public interest concerns beyond those articulated by the parties. United States v. Morgan, 307 U.S. 183, 194, 59 S.Ct. 795, 83 L.Ed. 1211 (1939). In this extraordinary situation, the steel producers have since 1969 engaged in actions designed to further an arrangement that all assumed was lawfully entered into. The need to protect the reliance interests of these parties is highlighted by the complexity and the closeness of the issue of the validity of executive action. Compare Blair v. Freeman, 125 U.S.App.D.C. 207, 217, 370 F.2d 229, 239 (1966). Accordingly, in my view, a declaration that executive participation in the agreements is invalid should be given prospective effect only. This would permit courts to rule, should the question arise, that liabilities of the parties for acts prior to the effective date of the judgment be determined as if executive participation in the agreements were valid. Compare Zuber v. Allen, 131 U.S.App.D.C. 109, 124-125, 402 F.2d 660, 675-676 (1968), aff'd, 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969).
 
 
 113
 It remains to consider the prospective effect that I would give a holding that the action here was outside Executive authority. It is likely that the Executive would have had authority to invoke the national security clause-- if minded to do so after following its hearing procedures and appraising the comments of all affected interests. Here the Executive has failed to follow the procedures mandated by Congress. In reviewing the decision of an administrative agency that has not exceeded its powers but has failed to follow due procedures, we have, in appropriate cases, remanded the action to the agency to allow subsequent correction of the deficiency, without destroying the original decision. See Kennecott Copper Corporation v. EPA, 149 U.S.App.D.C. 231, 462 F.2d 846 (1972); International Harvester Company v. Ruckelshaus, 155 U.S.App.D.C. 411, 478 F.2d 615 (1973); Portland Cement Association v. Ruckelshaus, 158 U.S.App.D.C. 308, 486 F.2d 375 (1973), cert. denied, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974). I believe that an analogous disposition would be appropriate for the present case. I would withhold the court's mandate for a period of 90 days. This would permit the President, if he should conclude that it is now desirable to limit steel imports and that either the escape clause or the national security provision is applicable, to invoke their procedures.
 
 
 114
 Alternatively, the President may wish to seek legislation authorizing him to negotiate the kind of voluntary import restraints at issue here, or perhaps broader import control authority. The terms and history of any such legislation might support a ruling of a ratification of the authority of the President to achieve the steel arrangements before us. I would consider it appropriate to entertain an application by the Government for this court to stay its mandate so as to provide a reasonable opportunity to consider validating legislation.
 
 
 115
 Although I would decide this case against the executive, I am sensitive to the delicacy of the issue of preemption. Where, as here, the power of Congress to regulate a matter committed expressly to it by the Constitution is at stake, a close case should be decided so as to protect Congressional power. But it is likewise appropriate, in a matter so laced with delicate international relationships, for the court to shun a Procrustean rigidity in deference to possible clarification or correction by the President and Congress together.
 
 
 116
 Appendix: Executive Limitation of Imports Outside Statutory Authority
 
 
 117
 The Government and the domestic steel producers cite four examples in support of their contention that there exists a 'long-standing executive practice' of obtaining import restrictions without resort to any statutory authority. I will discuss each of these seriatim.
 
 
 118
 I. Restrictions on Japanese Imports During 1930 Decade
 
 
 119
 On October 12, 1935, the State Department announced that Japanese exporters were restricting their shipments of cotton piece goods to the Philippine Islands (then an American protectorate) to a fixed annual quota, 'provided there is no increase in the Philippine tariff.' 3 Foreign Relations of the United States, 1935, at 1008-09 (1953). Although the Department's release described the arrangement as unilateral action by Japanese manufacturers, memoranda of talks during the preceding six months between Department officials and the Japanese ambassador refer to the arrangement as an 'agreement' or a 'gentlemen's agreement.' See 3 Foreign Relations of the United States, 1935, supra, at 951-1048.
 
 
 120
 On December 21, 1935, similar restrictions on the export of Japanese cotton goods to the United States were announced. 13 State Department Press Releases 581 (1935). The Department's press release stated that the Japanese ambassador was responding to State Department suggestions that 'some agreement be reached providing for voluntary control by Japanese exporters.'
 
 
 121
 On April 4, 1936, the State Department announced that Japanese exporters of cotton rugs had agreed to observe annual quotas on specific products. 14 State Department Press Releases 291 (1936).
 
 
 122
 The foregoing arrangements were all negotiated through regular diplomatic channels rather than by direct government-to-industry communication.
 
 
 123
 II. Limitation on Canadian Red Cedar Shingles, 1936
 
 
 124
 The defendants also cite a 1936 statement by Senator Nye. The statement describes an agreement with Canada to limit the import of Canadian red cedar shingles to 25% Of the domestic consumption, see 80 Cong.Rec. 9107-08 (1936), but it adverts to the Reciprocal Trade Agreements Act of 1934, 48 Stat. 943, which empowers the President to 'enter into foreign trade agreements with foreign governments or instrumentalities thereof' and to proclaim 'such additional import restrictions . . . as are required or appropriate to carry out any foreign trade agreement the President has entered into.'
 
 
 125
 III. The List Presented by Secretary of State Dulles
 
 
 126
 Voluntary restraints pertaining to ten commodities were cited by Secretary of State Dulles in testimony before the House Ways and Means Committee, during its consideration of the Trade Agreements Extension Act of 1958. Hearings on Renewal of Trade Agreements Act Before the House Committee on Ways and Means, 85th Cong., 2d Sess. 399 (1958). The commodities are simply listed as 'items on which voluntary quotas have been imposed since January 1, 1953, by exporting countries.' No information is given as to the character of the restraints, the dates on which they were imposed, or their duration. Moreover, the President appears to have acted in this case within the broad authority given him by the Trade Agreements Extension Acts of 1951, 1953 and 1955. The President was empowered in pursuance of trade agreements made under these Acts to impose additional imports restrictions as are appropriate to carry out any foreign trade agreement, as well as to implement restrictions under the escape clause, or, after 1955, the national security provision.
 
 
 127
 Procedural requirements were attached to the exercise of these statutory powers, and with respect to most of the commodities these requirements were substantially met. (See Table 1.) All but two of the commodities (items 5 & 7) were the subject of Tariff Commission investigation and hearings. The Commission recommended relief on six of the eight commodities which were the subject of an investigation (items 1, 3, 4, 6, 9, 10), and the President proclaimed restrictions on five of these (items 1, 3, 4, 6, 9).
 
 
 128
 The pattern is not entirely consistent. Voluntary restraints may have been negotiated on hardwood, plywood, sewing machines, toyo cloth caps, and tuna without Commission action. Yet the evidence taken as a whole negatives the assumption of a deliberate, advertent disregard of statutory procedures, predicated on an asserted inherent executive authority untrammeled by Congressional action. In my view, the information provided to Congress was not sufficient to put Congress on notice that Presidential power to act outside statutory authority was being claimed, and it is insufficient now to establish Congressional acquiescence.
 
 
 129
 IV. 1956 Agreement With Japan Limiting Textile Imports
 
 
 130
 On May 16, 1956, the United States concluded an agreement with Japan limiting the import of Japanese textiles. The agreement resulted from communications between the governments since 1955, a period during which domestic manufacturers had expressed great concern about Japanese textile imports and had filed several petitions before the Tariff Commission[32] for escape clause relief.
 
 
 131
 At approximately the same time, proposed legislation that eventually became 204 of the Agricultural Act of 1956, 70 Stat. 188, was pending in Congress. It would authorize the President to negotiate with foreign governments in order to obtain agreements limiting imports of agricultural commodities or textile products, and to issue regulations governing the entry or withdrawal from warehouse of products subject to such agreements. See H.R.Report No.1986, 84th Cong., 2d Sess. 15 (1956). The legislation that included this provision was passed by both houses of Congress, but was vetoed because of its commodity price support provisions. See 102 Cong.Rec. 6107 (Senate passage), 6158 (House passage), 6317-18 (President's veto message) (1956).
 
 
 132
 An identical provision was incorporated in legislation introduced in the House after the veto, see 102 Cong.Rec. 7229 (1956); H.R.Rep.No.2077, 84th Cong., 2d Sess. 8-9 (1956), and its applicability to the then-prevailing concern about Japanese textile imports was pointed out by Representative Cooley, House sponsor of the bill. See 102 Cong.Rec. 7346 (1956). Legislation delegating the new authority was passed by both houses[33] and was signed into law on May 28, 1956.[34]
 
 
 133
 The agreement with the Japenese government was concluded eight days before the authorizing legislation received final approval, but the quotas were not announced publicly until January, 1957. In context, the exchange of notes was a de facto interchange in contemplation of the de jure executive authority that Congress was about to provide. To all public appearances the textile quotas were not established until after the authorizing legislation had been enacted. Subsequent to 1956 the statute has been represented to Congress, and cited by commentators, as the authority for the agreement. See Hearings on H.R. 9900 Before the House Committee on Ways and Means, 87th Cong., 2d Sess. 3794 (1962) (testimony of Secretary of Commerce Hodges); M.D.H. Smith, Voluntary Export Quotas and U.S. Trade Policy-- A New Nontariff Barrier, 5 Law & Policy in Int'l. Business 10, 31-32 (1973).
 
 V. Voluntary Quotas on Oil Imports
 
 134
 In July, 1954, President Eisenhower established an Advisory Committee on Energy Supplies and Resources Policy to study the development of energy resources. See Report of the Presidential Advisory Committee on Energy Supplies and Resources Policy, 1955-56, February 26, 1955, quoted in Cabinet Task Force on Oil Import Control, The Oil Import Question 163 (1970) (hereinafter cited as Oil Import Question). In November, 1954, a task force appointed by the Committee concluded that there was a possible threat to national security in 'reliance beyond present relative levels on foreign crude oil to supply domestic markets' and recommended that the existing ratio of imports to domestic production be maintained by 'voluntary, individual action of the importing companies.' Oil Import Question 171. The Advisory Committee, in its report to the President in February, 1955, followed these recommendations. Oil Import Question 165-166. It is unclear precisely what, if any, government action followed from the Committee report. It was apparently limited to exhortations to oilimporting companies to exercise restraint. First Annual Report on the Operation of the Trade Agreements Program, H.Doc.No.93, 85th Cong., 1st Sess. 10 (1957).
 
 
 135
 The national security provision was enacted in June, 1955, in part because of concern with the President's authority to deal with oil imports. On October 17, 1956, the Presidential Advisory Committee renewed its recommendation to the President that the 1954 ratio be maintained in all but one region of the United States, but again recommended only voluntary, individual action. Oil Import Question 176-78. On October 22, however, the Director of the Office of Defense Mobilization held hearings in response to a petition that had been filed by petroleum companies in August, 1956, requesting action under the national security provision. At the hearing, the Director received views supporting and opposing Section 7 action to limit oil imports. On April 23, 1957, he advised the President that 'pursuant to section 7 of the Trade Agreements Extension Act of 1955 . . . I have reason to believe that crude oil is being imported into the U.S. in such quantities as to threaten to impair the national security.' Oil Import Questions 183, 194.
 
 
 136
 On June 26, the President established a Special Cabinet Committee to Investigate Crude Oil Imports, which on July 29 reported with a plan for limiting oil imports into each region, with import volume limits for individual companies to be determined and administered by the Department of the Interior and the Office of Defense Mobilization. The Committee's proposal contemplated voluntary compliance by the petroleum companies, but concluded that if no such compliance was forthcoming the President should 'find that there is a threat to the national security within the meaning of Section 7 . . ..' Oil Import Question 186. The President immediately directed the Secretary of the Interior and the Director of O.D.M. to implement the Committee's proposal.
 
 
 137
 The Voluntary Oil Import Program thus established continued for nearly two years. The President's Special Committee maintained oversight and, in January, 1959, requested that the Director of the Office of Civil and Defense Mobilization initiate another investigation. On February 27, 1959, the Director made another finding of harm to national security, and on March 10 the President proclaimed mandatory quotas, invoking his section 7 powers. Oil Import Question 195-203.
 
 
 138
 Although the defendants cite the oil program of 1957 as an illustration of Presidential establishment of 'voluntary' limitation of imports, without the aid of statutory authority, the program was created only after the Director of O.D.M. held hearings and made the finding mandated by section 7. The Special Committee's plan and the President's approval of it were reported to Congress as actions under the national security amendment to the trade acts. See Second Annual Report on the Trade Agreements Program, H.Doc.No.384, 85th Cong., 2d Sess. 8 (1958); Third Annual Report of the President of the United States on the Trade Agreements Program 12 (1959). The President did not invoke the full extent of his section 7 authority, but, having complied with the statutory procedures, the President was entitled to exercise less than the full measure of his statutory authority.[35] The voluntary program limiting oil imports appears to illustrate flexible Presidential action precisely in the manner contemplated by Congress when it passed the national security provision.
 
 
 
 [1]
 The District Court heard the matter on cross-motions for summary judgment, and the facts are not in dispute. This section of the opinion draws mainly upon the affidavit of Julius L. Katz, one of the State Department defendants and Deputy Assistant Secretary of State for International Resources and Food Policy, filed in support of the motion for summary judgment
 
 
 [2]
 The bulk of steel import increases were not attributed to the Kennedy Round reductions in tariffs, which would be continuing in nature, because they predated the effective dates of those reductions, and cost and price differentials between foreign and domestic products greatly exceeded the pre-reduction tariffs
 
 
 [3]
 Factors believed to cause the import increase, such as excess capacity and a technological advantage in the foreign steel industry, were both regarded as probably shortrun phenomena. Whether foreign governments' policies of assisting their steel industries, and lower labor costs abroad, were also thought to be temporary in nature is not clear
 
 
 [4]
 The letters to the Secretary, dated December 23, 1968, were approvingly read by President Johnson after their receipt, and were transmitted by the Secretary on January 14, 1969, to the respective Chairmen of the Senate Finance Committee and the House Ways and Means Committee. The recipients thereupon issued a joint announcement welcoming the voluntary restraints and releasing the texts of the producers' and the Secretary's letters. No mandatory import quota legislation was recommended by the committees thereafter
 
 
 [5]
 The British steel industry, which had not participated in the 1968 statements of intent, joined in the 1972 letter from the European Communities steel producer associations. It did so through both the British Independent Steel Producers Association and the British Steel Corporation, an enterprise controlled by the British government
 
 
 [6]
 It is undisputed that 'in negotiating the arrangements and all of their specific terms, the State Department officers explained to the foreign producers that they were being asked to make the requested commitments by the Executive Branch of the United States Government on the ground that they were in the national interest of the United States.' JA 155a
 
 
 [7]
 In a post-argument communication to the District Court, the Department of Justice represented that no assurances of immunity from the antitrust laws had been given to anyone. It went on to say that 'the Executive Branch did not and it would not request any party to enter into any arrangement it believed to be unlawful.'
 
 
 [8]
 As might be expected in light of the stipulation, the amended complaint nowhere refers expressly to the Sherman Act. Under the caption 'VIOLATION OF LAW ALLEGED,' it charges that the actions of the State Department defendants constitute a prohibited regulation of foreign commerce 'within the meaning of the laws of the United States relating to the regulation of foreign trade as set forth in Title 19 of the United States Code, including Sections 301 and 352 of the Trade Expansion Act of 1962, 19 U.S.C. Sections 1901, 1982.' Having asserted these actions to be unlawful for this reason, the complaint does go on to say that the State Department defendants, by securing the limitation arrangements in a manner not authorized by Congress (i.e., by not using the provisions of Title 19), acted in conflict with the power of Congress 'to determine the antitrust policy of the United States by enacting the antitrust laws and to determine the circumstances under which exceptions to those laws shall be permitted.' To the extent that this seems to say that there was an antitrust violation because the State Department officials did not employ the provisions of Title 19, the point fails in the light of our holding hereinafter that the Executive did not engage in conduct implicating those provisions
 We note that the third and last paragraph under this caption in the amended complaint alleges that the foreign defendants acted in violation only of provisions of Title 19, which, of course, does not contain the Sherman Act. The domestic steel producers, in our reading of the amended complaint, are not alleged to have acted in violation of any law.
 
 
 [9]
 The other stated purposes were 'to strengthen economic relations with foreign countries through the development of open and nondiscriminatory trading in the free world'; and 'to prevent Communist economic penetration.' 19 U.S.C. 1801
 
 
 [10]
 The Katz affidavit asserts that consideration was given to the utilization of both Section 352 and Section 232. The former 'could not seriously be considered' because it was in terms made available by Congress only for the purpose of softening injuries to domestic commerce caused in major part by prior concessions in trade agreements; and this was not a major cause in this instance. As to Section 232, national security was only one of the factors contributing to the problem, and the attempt to solve it by a method which armed the President with legislative power to stop foreign imports at the water's edge would have had an unfortunate impact on foreign trade policy and international relationships
 
 
 [11]
 The United States Customs Court has quite recently invalidated the imposition by Presidential proclamation of a 10% Supplemental tariff increase on imported merchandise. Yoshida International, Inc. v. United States, 378 F.Supp. 1155 (Cust.Ct.1974). This action was held by the court to be an exercise of legislative power by the Executive in the regulation of foreign commerce, for which no delegated authority could be discerned in the statutes relating to tariffs. We mention the case not with reference to the rightness or wrongness of the decision but only because of the contrast between the action taken by the Executive in that case, i.e., goods from abroad were excluded by force of asserted law unless the supplemental duties were paid, with what was done here, i.e., no legal power to exclude foreign steel imports was either claimed or exercised by the Executive
 
 
 [12]
 In 1969 the Japanese, and in 1972 all foreign producers, exported to the United States more steel or particular types of steel product than their undertakings contemplated. In no case were the 'excess' goods denied entry into the United States. Rather, consultations were sought and the next year's voluntary quota reduced by the amount of the excess
 
 
 [1]
 Cf. United States v. Guy W. Capps, Inc., 348 U.S. 296, at 297, 75 S.Ct. 326, 99 L.Ed. 329 (1955) refusing to pass upon the ruling by the court of appeals (204 F.2d at 658) that an international agreement to limit Canadian exports was void 'as not authorized by Congress and as contravening the provision for procedure through the Tariff Commission', id. 348 U.S. at 301, 75 S.Ct. at 329. See Appendix, id. at 305, 75 S.Ct. 326
 
 
 [1]
 Affidavit dated August 25, 1972, of Julius L. Katz, Deputy Assistant Secretary of State for International Resources and Food Policy, Bureau of Economic Affairs, paragraph 14
 
 
 [2]
 Paragraph 5 of the May 2, 1972, letter of the associations of the steel producers of the U.K. and the EEC, provides:
 Consultations-- The above-mentioned producer associations, through their authorized representatives, hold themselves ready to consult with representatives of the United States Government on any problem or question that may arise with respect to this voluntary restraint undertaking. They expect that, similarly, the United States Government would be prepared to consult with their representatives on any problem or question that may arise with respect to this voluntary restraint undertaking. They reserve the right to request consultation in the event that they consider they have been placed in a disadvantageous position with respect to other exporters of steel to the United States by developments in the international steel market taking place subsequent to entering this undertaking, or if developments in the international steel market should take place which could substantially impair the carrying out of this undertaking. Similarly, they recognize that the United States Government may request consultation if it considers that developments in the international steel market have taken place during the term of this undertaking which substantially affect any of the provisions of this arrangement.
 The above-mentioned producer associations reserve the right to request consultation with respect to the exclusion in particular situations from the export limitation quantity in paragraph 1 above of shipments of large-diameter line pipe.
 The May 4, 1972 letter of the Japanese steel producers contains a virtually identical paragraph.
 
 
 [3]
 Affidavit of Mr. Katz, P7, JA 115a-117a, referring to 1968 consideration 'by senior officials of the responsible agencies of the Government.'
 
 
 [4]
 Letters of the European Economic Community and United Kingdom associations of steel producers and of the Japan Iron and Steel Exporters' Association, P6, JA 131a and 137a
 
 
 [5]
 See pp. 146-148 supra
 
 
 [6]
 See the 1935 limitation on imports of Japanese cotton goods and the 1936 limitation on imports of Japanese cotton rugs, both described in the Appendix, infra
 
 
 [7]
 This assumes the court would pass on the merits. A court might well dismiss an action on another ground, like lack of clean hands
 
 
 [8]
 See p. 155 infra
 
 
 [9]
 See pp. 155-156 infra
 
 
 [10]
 Defendants cite a statement in the conference report accompanying the first national security provision that 'it is the understanding of all the conferees, both House and Senate, that it is not intended to, and does not, diminish or impair any authority the President may have under any other law.' H.R. Report No. 745, 84th Cong., 1st Sess. 6 (1955)
 The Conference Report, however, continues: For example, it was emphasized that if the President sees fit to stockpile critical materials under any other law that action may be taken wholly aside from the authority contained in this amendment.
 The circumspection of Congress, in avoiding any possible contention that it intended to limit other authority of the President, like the stockpiling of critical materials, cannot fairly be stretched into an acquiescence in an inherent general authority to limit imports.
 The same approach undercuts defendants' reliance on a statement in the House Report accompanying the Trade Agreements Extension Act of 1958, in which the national security provision was reenacted with modification: '. . . the President may also take any action available to him under any of his other powers.' H.R.Rep.No.1761, 85th Cong., 2d Sess. 14 (1958). The entire sentence in the House Report reads:
 In emergencies and for such time as necessary, the President may also take any action available to him under any of his other powers.
 Defendants have never attempted to characterize the executive action taken here a response to an emergency. The foregoing language seems irrelevant to the problems before us.
 
 
 [11]
 In 1962 the Senate approved a bill with a broad authority in the President to limit imports, in this provision (denominated as 353):
 Notwithstanding any other provision of law, the President may, when he finds it in the national interest, proclaim with respect to any article imported into the United States--
 (3) the imposition of such other import restrictions as he finds necessary. H.R. 11970, 89th Cong., 2d Sess. (1962).
 This provision did not survive in the Trade Expansion Act of 1962 because it was deleted in Conference. See H.R.Rep.No.2518, 87th Cong., 2d Sess. 13 (1962).
 The other proposal to enlarge Presidential authority to restrict imports emerged during consideration of the Revenue Act of 1971. New quota authority was proposed by the Senate to meet balance-of-payments emergencies, which were defined with a breadth sufficient to justify the present quotas. Again, however, the proposal was rejected during House-Senate Conference. H.R.Rep.No.708, 92d Cong., 1st Sess. 54 (1971).
 
 
 [12]
 Section 336, 46 Stat. at 701
 
 
 [13]
 19 U.S.C. 1821(a)
 
 
 [14]
 19 U.S.C. 1821(a)
 
 
 [15]
 See S.Rep.No.2059, 87th Cong., 2d Sess. 7 (1962); H.R.Rep.No.1818, 87th Cong., 2d Sess. 2 (1962)
 
 
 [16]
 19 U.S.C. 1841
 
 
 [17]
 19 U.S.C. 1841
 
 
 [18]
 19 U.S.C. 1842
 
 
 [19]
 19 U.S.C. 1843
 
 
 [20]
 E.g., the Sugar Act of 1948, ch. 519, 1 et seq., 61 Stat. 922-934, as amended, 7 U.S.C. 1100 et seq.; the Meat Act of 1964, 2, 78 Stat. 594
 
 
 [21]
 Section 22(b) of the Agricultural Adjustment Act of 1933, as added, Act of August 24, 1935, ch. 641, 31, 49 Stat. 773, as amended, 7 U.S.C. 624(b)
 
 
 [22]
 See, e.g., Hearings on H.R. 9900 Before the House Committee on Ways and Means, 87th Cong., 2d Sess. 3853-55 (1962); M.D.H. Smith, Voluntary Export Quotas and U.S. Trade Policy-- A New Nontariff Barrier, 5 Law & Policy in Intl. Business 10, 31-32 (1973)
 
 
 [23]
 Codified in 19 U.S.C. 1982, and captioned 'Orderly marketing agreements.'
 
 
 [24]
 In Section 7 of the Trade Agreements Extension Act of 1955, 69 Stat. 162. This was modified by Section 8 of the Trade Agreements Extension Act of 1958, 72 Stat. 673
 
 
 [25]
 19 U.S.C. 1862(c)
 
 
 [26]
 H.R.Rep.No.1761, 85th Cong., 2d Sess. 15 (1958)
 
 
 [27]
 O.E.P.Reg.No.4, Sec. 7(b), 7(e), 7(f); 32A C.F.R. 97 (1973)
 
 
 [28]
 Compare Natural Gas Act, 5, 15 U.S.C. 717d (FPC shall determine 'just and reasonable rate(s)' after hearing); Federal Aviation Act of 1958, 401, 49 U.S.C. 1371 (Board may issue license to engage in air transportation if it finds, after hearing, that transportation is 'required by the public convenience and necessity.'); Communications Act of 1934, 309, 47 U.S.C. 309 (hearings may be held on licenses to be granted in the 'public interest, convenience, and necessity.')
 
 
 [29]
 Professor Davis has suggested that a modern 'delegation doctrine' should embody a quest for safeguards against arbitrary action, including open procedures where precise standards limiting executive discretion are not available. K.C. Davis, Administrative Law Text 2.08 at 44 (3d ed. 1972). Compare Yakus v. United States, 321 U.S. 414, 433 ff., 64 S.Ct. 660, 88 L.Ed. 834 (1944); Amalgamated Meat Cutters and Butcher Workmen of North America, AFL-CIO v. Connally, 337 F.Supp. 737, 759-762 (D.D.C., 3-judge court, 1971)
 
 
 [30]
 Wilderness Society v. Morton, 156 U.S.App.D.C. 121, 144, 479 F.2d 842, 865 (1973)
 
 
 [31]
 Hearings on Renewal of Trade Agreements Act Before the House Committee on Ways and Means, 85th Cong., 2d Sess. 399 (1958)
 
 
 [32]
 The negotiation of the agreement and its terms are described in W. Hunsberger, Japan and the United States in World Trade 317-22 (1964)
 
 
 [33]
 See 102 Cong.Rec. 7450 (House passage), 8514 (Senate passage). The Conference Report on the legislation, which resolved differences between the houses not material here, was adopted on May 23. See 102 Cong.Rec. 8684 (Senate passage), 8832 (House passage)
 
 
 [34]
 See 102 Cong.Rec. 9799 (Presidential approval)
 
 
 [35]
 This conclusion is strengthened by a later representation to Congress that the President's actions were taken pursuant to the national security provision. See Hearings on Renewal of Trade Agreements Act Before the House Committee on Ways and Means, 85th Cong., 1st Sess. 2685 (1958) (statement of Deputy Under Secretary of State C. Douglas Dillon)
 Commodities on which Foreign Governments Imposed Export Limitations
 1953-1958
 (Cited in testimony of Secretary Dulles Before
 House Committee on Way & Means)
-------------------------------------------------------------------------------
 Authority
 for Presidential
 Commodity Tariff Commission Action TC Action Action
-------------------------------------------------------------------------------
 1. Cotton a. Continuing investigations a. Sec. 22 a. Comprehensive
 textiles held since composition Agricult- quotas
 ural
 of quotas in 1939 Adjustme- proclaimed
 nt
 by Presidential Act Sept. 5, 1939;
 proclamation. Hearings additional
 held August, 1939; goods
 December, 1940; added
 December, 1941; May, pursuant
 1942; October, 1946; to Tariff
 February, 1947; Commission
 February, 1948; July, recommendations,
 1949; July, 1950; Feb. 1, 1947.
 September, 1950; b. Voluntary
 November, 1950; June, quotas
 1951; November, 1957; negotiated
 April, 1958; May, 1958; with Japan,
 April, 1959. Various concluded by
 modifications of quotas diplo-
 matic
 originally imposed in excha-
 nge of
 1939 recommended. notes.
-------------------------------------------------------------------------------
 2. Hardwood Hearings held March 22-25, escape None pursuant to
 plywood 1955. Recommended no clause escape clause;
 modification of voluntary
 concession June 2, limitation
 1955. by exporting
 countries.
-------------------------------------------------------------------------------
 3. Lead & a. Hearings held Nov. 3-6. escape a. President
 & Zinc Recommended modification clause rejected
 of concession May 21, Commission
 1954. recommendations
 b. Hearings held Nov. 19-26, of May 21,
 Recommended modification 1954, on
 of concessions April 24, Aug. 20, 1954.
 1958. Commission b. President
 unanimously recommended proclaimed
 escape-clause relief quotas Sept.
 but divided (3-3) on 22, 1958,
 remedy. * Three following
 Commissioners divided vote
 recommended raising of
 duties and establishing Commission.
 quotas; remaining three
 recommended raising
 duties only.
-------------------------------------------------------------------------------
 4. Oats a. Hearings held Sec. 22 a. President
 July 7-8, 1953. Agricult- announced no
 ural
 Recommended import Adjustme- action on
 nt
 quotas. Act. Canadian oats
 b. Hearings held Sept. in view of
 1954. Recommended Canadian
 import quotas. decision to
 limit shipments
 until Oct. 1,
 1954. Quota
 on all
 other oats
 proclaimed
 Dec. 26,1953.
 b. President
 proclaimed
 quotas on all
 oats Oct. 4,
 1954.
-------------------------------------------------------------------------------
* Sec. 20(d) of Trade Agreements Extension Act of 1953 provides that where
Commissiion divides 3-3, President may treat findings and recommendations of
either group as findings of entire Commission.
-------------------------------------------------------------------------------
 5. Sewing None recommended. ------ Voluntary
 machines limitation
 by exporting
 country.
-------------------------------------------------------------------------------
 6. Stainless a. Hearings held July escape a. March 7, 1958,
 steel 16-19, 1957. clause deferred
 table Recommended withdrawal action on
 flatware of consession Jan. 10, Commission
 1958. Commission recommendation
 divided (3-3) on remedy. in view of
 Three members recommended voluntary
 withdrawal of concession limitation
 as to all flatware; of exports
 remaining three by Japan;
 recommended withdrawal requested
 with respect to supplementary
 certain items. report from
 b. Following President's Commission.
 deferral of action, b. Oct. 21,
 held hearings April 1959
 21-22, 1959 and President
 submitted supplemental proclaimed
 report to President tariff
 July 24, 1959. quotas
 Additional
 recommendations,
 if any, unknown.
-------------------------------------------------------------------------------
 7. Toyo Investigation instituted escape Voluntary
 cloth April 5, 1957, and clause limitation by
 caps dismissed without hearing exporting
 June 21, 1957. country.
-------------------------------------------------------------------------------
 8. Tuna a. Hearings held Jan.- escape Voluntary
 Feb., 1952; clause limitation by
 recommended no exporting
 modification of trade country.
 concessions on Nov. 16,
 1952.
-------------------------------------------------------------------------------
 9. Tung oil a. Investigation and Sec. 22 a. No
 & tung hearings held May 4-5 Agricult- Presidential
 ural
 nuts & 7-8, 1953; Commission Adjustme- action.
 nt
 recomended no Act b. President took
 action. no
 b. Hearing held Aug. 10, action in
 1954. Recommended view of
 aggregate quotas. voluntary
 c. Hearings held May 2-3, undertakings
 1957. Recommended by Argentina
 import fee (tung oil and Paraguay.
 only). c. Quotas imposed
 d. Hearings held March 10, by
 1958; Presidential
 recommended tung oil proclamation
 contained in tung nuts be Sept. 9,
 brought within existing 1957,
 quota on oil. to last until
 1960.
 d. President
 implimented
 Commission
 recommendations
 on April 28,
 1958.
-------------------------------------------------------------------------------
 10. Wood a. Investigation without escape Following report
 screws hearings completed clause of equally
 Dec. 29, 1951. divided
 Recommended no Commission
 modification of Oct. 28, 1954,
 of concession. President decided
 b. Hearings held June. against modifying
 30-July 1, 1952. concession;
 Recommended no voluntary
 modification of limitation
 consession. by exporting
 March 27, 1953. country followed.
 c. Hearings held May 26-27,
 1954. Commission
 on whether relief
 warranted October 28,
 1954.
 d. Investigation instituted
 Jan. 26, 1956;
 discontinued April 9,
 1956, at request of
 applicant.