518 F.2d 1051
 171 U.S.App.D.C. 113, Energy Mgt. P 26,012
 Algonquin SNG, INC., et al., Petitioners
v.
FEDERAL ENERGY ADMINISTRATION, Respondent.
COMMONWEALTH OF MASSACHUSETTS and Michael S. Dukakis,
Governor, et al., Petitioners,
v.
FEDERAL ENERGY ADMINISTRATION, Respondent.
COMMONWEALTH OF MASSACHUSETTS et al., Appellants,
v.
William E. SIMON, et al.
ALGONQUIN SNG, INC., et al., Appellants,
v.
William E. SIMON et al.
 Nos. 75-1202, 75-1206, 75-1281 and 75-1282.
 United States Court of Appeals,
District of Columbia Circuit.
 Aug. 11, 1975.
 
 Harold B. Dondis, Boston, Mass., of the bar of the Supreme Judicial Court of Mass., pro hac vice, by special leave of court, with whom William R. Connole, Washington, D. C., was on the brief for petitioners in Nos. 75-1202 and 75-1282. Ernest C. Baynard, III, Washington, D. C., for all petitioners.
 Francis X. Bellotti, Atty. Gen., of Mass., with whom James S. Hostetler, Washington, D. C., was on the brief, for petitioners in Nos. 75-1206 and 75- 1281. Albert D. Sturtevant, Washington, D. C., for petitioners in No. 75-1281. William R. Connole, Washington, D. C., for petitioners in Nos. 75-1206 and 75-1281.
 Irwin Goldbloom, Deputy Asst. Atty. Gen., with whom Rex E. Lee, Asst. Atty. Gen. and Barrie L. Goldstein, Atty. Dept. of Justice, were on the brief, for respondents.
 Before TAMM, LEVENTHAL and ROBB, Circuit Judges.
 Opinion for the Court filed by Circuit Judge TAMM.
 Dissenting opinion filed by Circuit Judge ROBB.
 TAMM, Circuit Judge:
 
 
 1
 In these consolidated appeals, plaintiffs-appellants Commonwealth of Massachusetts, et al. seek to overturn the imposition of license fees for importation of oil and petroleum products as required by certain Proclamations of President Ford and former President Nixon and as implemented through regulations adopted by the Federal Energy Administration (FEA). Appellants assert that the challenged presidential actions were beyond their claimed statutory authority under 19 U.S.C. § 1862(b) (1970) and that the Proclamation and regulations in question were promulgated without adherence to certain procedural prerequisites. We hold today that the executive is without substantive authority to impose license fees of the magnitude at issue here.
 
 I. Factual Background
 
 2
 The operative statute, 19 U.S.C. § 1862(b) (1970), authorizes the President to
 
 
 3
 take such action, and for such time, as he deems necessary to adjust the imports of (an) article and its derivatives so that . . . imports (of such article) will not so threaten to impair the national security.
 
 A. The Eisenhower and Nixon Programs
 
 4
 The program under which the challenged fees were imposed was initiated in 1959 by President Eisenhower under his section 1862(b) authority in Presidential Proclamation 3279. See 19 U.S.C. § 1862 note. The so-called Mandatory Oil Import Program (MOIP) was based on a determination that foreign petroleum[1] was being imported into the United States in such quantities and at such low costs as to threaten to impair national security by inhibiting the development of domestic production and refinery capacity. Proclamation 3279 required each petroleum importer to secure a license, divided the country into five districts, and established an import quota for each district. The Secretary of Interior was directed to allocate the quota among individuals with an existing refining capacity or import history. Although subsequently amended twenty-five times,[2] the MOIP quota system remained in effect from 1959 to May 1, 1973.
 
 
 5
 Proclamation 4210, effective May 1, 1973, announced by former President Nixon, inaugurated a radical change in the system. See 19 U.S.C.A. § 1862 note; 38 Fed.Reg. 10725 (1973). Under this new plan, the quota system was abolished. Instead, the issuance of import licenses was conditioned on a schedule of license fees to be phased in during the period May 1, 1973 through November 1, 1975.[3] The impact of the fee system was tempered by a provision that allowed fee-free imports up to a person's previous quota allocation; these fee-free allocations were to be phased out gradually until 1980, when license fees would be required on all imports covered under the Proclamation. Finally, Proclamation 4210 abolished the tariff on petroleum. Proc. 4210 § 16.
 
 B. The Ford Plan
 
 6
 Section 1862(b) authorizes presidential action only after receipt of advice from the Secretary of the Treasury that an article is being imported in quantities or under circumstances as to threaten to impair the national security. The Secretary may not transmit such advice to the President under this section until he has made an appropriate investigation to determine the effects on national security, during which he must consult with the Secretaries of Defense and Commerce and other appropriate officers.[4] Finally, the Trade Act of 1974, 88 Stat. 1978, effective January 3, 1975, amended section 1862(b) to include the provision that "(t)he Secretary shall, if it is appropriate and after reasonable notice, hold public hearings or otherwise afford interested parties an opportunity to present information and advice relevant to such investigation."
 
 
 7
 On January 4, 1975, the day after the amendment became effective, Secretary of the Treasury, William E. Simon, undertook an investigation to determine whether the current level of petroleum imports threatened national security. In a letter delegating the investigation to Assistant Secretary David R. MacDonald, Secretary Simon stated:
 
 
 8
 In my judgment, national security interests require that the procedures requiring public notice and opportunity for public comment or hearings . . . not be followed in this case. I further find that it would be inappropriate to hold public hearings, or otherwise afford interested parties an opportunity to present information and advice relevant to the investigation as provided by Section 232, as amended by the Trade Act of 1974.
 
 
 9
 J.A. 66.
 
 
 10
 Thereafter, comments were solicited from the Departments of State, Defense, Interior, Commerce and Labor, the Council of Economic Advisors, and the Federal Energy Administration.[5] On January 14, 1975, Secretary Simon reported as the result of his investigation that petroleum products were "being imported into the United States in such quantities as to threaten to impair the national security" and recommended that
 
 
 11
 appropriate action be taken to reduce imports of crude oil, principal crude oil derivatives and products, and related products derived from natural gas and coal tar into the United States, to promote a lessened reliance upon such imports, to reduce the payments outflow and to create incentives for the use of alternative sources of energy to such imports. I understand that a Presidential Proclamation pursuant to (section 1862(b)) is being drafted by the Federal Energy Administration consistent with these recommendations.
 
 
 12
 A. 44.
 
 
 13
 On January 23, 1975, President Ford signed Proclamation No. 4341 which provided for a significant increase in the license fees initially imposed by former President Nixon. First, the fee schedule announced in 1973 was accelerated to their maximum levels of $0.21 per barrel on imported crude oil and $0.63 per barrel on petroleum products. Second, Proclamation 4341 imposed supplemental fees of $3 per barrel on imported crude oil and $1.20 per barrel on petroleum products. The supplemental fee on crude oil was to be instituted in three monthly dollar steps from February to April, while the petroleum products fee was to be added in March and April, 1975.[6]
 
 
 14
 On January 27, 1975, plaintiffs-appellants filed suit in district court. Plaintiffs, including eight states and their governors,[7] ten utility companies,[8] and one member of Congress,[9] asserted that the fees imposed by Presidents Nixon and Ford in Proclamations 4210 and 4341 exceeded their authority under 19 U.S.C. § 1862(b), that the Secretary of the Treasury failed to comply with the procedural requirements of that section, and that the government had failed to file a required environmental impact statement.
 
 
 15
 In a February 21st Order, the district court found jurisdiction under 28 U.S.C. §§ 1331 and 1340 and rejected the contention that the action was barred by the Tax Anti-Injunction Act, 26 U.S.C. § 7421 (1970). Although finding that appellants would suffer irreparable injury by the implementation of the program, the court refused to grant injunctive relief. The court found that the scope of presidential authority under section 1862(b) encompassed the power to impose license fees, "a regulatory measure enacted for the protection of national security." J.A. 290. The court also held that the Secretary of the Treasury had fulfilled the procedural requirements of section 1862(b) and that the failure to file an environmental impact statement was excused by an "emergency situation." J.A. 293. Final judgment was entered on March 11, 1975,[10] and this appeal followed. On February 27, 1975, appellants also filed, pursuant to 15 U.S.C. § 766(i)(2)(A), a Petition for Review of emergency regulations promulgated by the Federal Energy Administration to implement the Ford supplemental fee program. See 40 Fed.Reg. 10437 (1975). In both appeals, now consolidated, appellants renew the contentions made to the district court.[11]
 
 II. Merits
 
 16
 There is no controversy over the need for action to extricate this country from its increasingly dangerous dependence on foreign petroleum. Spending on foreign oil has increased from.$2.7 billion in 1970 to about $24 billion in 1974, J.A. 187. In 1973, the United States was subjected to an oil embargo with disasterous economic consequences. As the district court stated: "The grave necessity of decreasing our dependence on foreign oil, and developing our own domestic industry and alternative sources of energy was and is a matter of primary national importance." J.A. 288-89.
 
 
 17
 Appellants do not challenge the Presidents' findings in this area but argue that the license fee program instituted by Presidents Nixon and Ford were beyond their statutory authority under section 1862(b). Pointing to the statutory directive to "adjust imports", they assert that the legislative intent behind this provision was to grant authority to impose only direct import controls, such as quotas. Further, appellants rely heavily on the recent Supreme Court decisions in National Cable Television Association, Inc. v. United States, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974) and
 
 
 18
 The Government and the President point to the statutory mandate to the President to "take such action . . . as he deem necessary" as evidencing the broad grant of authority in section 1862(b). This national security authority, they opine, encompasses both indirect and direct methods of adjusting imports, and thus would include the license fee program. The district court upheld the program, finding it
 
 
 19
 one of a number of possible actions covered in the non-defined phrase "to adjust imports" contained in (section 1862(b)) and that the program including the fee is a regulatory measure enacted for the protection of national security. Certainly, if the term includes quotas and even a complete embargo, as plaintiffs admit, it can responsibly be interpreted to include imports subject to fees, however steep.
 
 
 20
 J.A. 290.
 
 
 21
 We must disagree and instead conclude that section 1862(b) does not authorize these fees. We reach this conclusion after studying the consistently explicit, well-defined manner in which Congress has delegated control over foreign trade and tariffs; the Government's construction of section 1862(b) would be an anomalous departure from that approach. We also find support for appellant's position in the legislative history of section 1862(b), both during its original passage in 1955 and its reenactment in 1962. Finally, recent Supreme Court pronouncements mitigate against the expansive statutory construction advanced by the Government.
 
 
 22
 * Section 1862(b) was originally enacted in the Trade Agreements Extension Act of 1955 and is currently contained within the Trade Expansion Act of 1962. The purpose of both these bills was to assist this country's economic development through stimulation and expansion of foreign trade. See, e. g., 19 U.S.C. § 1801 (1970). The statutes represent the most recent solution to a political struggle which has continued throughout our history whether United States trade policy should be utilized to increase foreign markets or to protect domestic industry. The arena for this debate over trade policy, the "lifeblood of our nation", has been Congress, and the 1955 and 1962 Acts, along with the Trade Reform Act of 1974 all represent accommodations of varying interests arrayed on both sides of the issue. See generally Metzger United States Foreign Trade: Past, Present, and Future, 6 Vill.L.Rev. 503 (1961).
 
 
 23
 The mechanism to effectuate the policy contained in all these statutes is the reduction of barriers through reciprocal trade agreements between the United States and its trading partners. Since, naturally, Congress could not as a body conduct barrier reduction negotiations, that authority was delegated to the President within congressionally-defined limits and made subject to well-established safeguards. See e. g., 108 Cong. Rec. 19867 (1962) (statement of Senator Humphrey).
 
 
 24
 For example, section 201 of the 1962 Act, 19 U.S.C. § 1821 authorized the President to enter into agreements to ease restrictions which unduly burdened the foreign trade of the United States and modify existing restrictions to effectuate those agreements within specified limits.[12] Similarly, section 122 of the Trade Reform Act of 1974, 19 U.S.C. § 2132 delegates to the President power to meet balance-of-payments emergencies with duty surcharges, quotas, or both for a 150 day period. In fact, we may generalize from our examination of the myriad of trade provisions that congressional delegations have been narrow and explicit in order to effectuate well-defined goals. See, e. g., 19 U.S.C. §§ 1901, 1981 (injuries to domestic industries); id. §§ 2251, 2253 (import relief for threatened domestic injuries); id. § 1351 (modify duties within limitations of 50% of existing tariff rates under reciprocal trade agreements). See also Consumers Union of United States, Inc. v. Kissinger, 165 U.S.App.D.C. 75, 506 F.2d 136, 141-43 (1974), cert. denied, -- U.S. --, 95 S.Ct. 2406, 44 L.Ed.2d 673 (1975).
 
 
 25
 Fitted against this scheme, the Government interpretation of section 1862(b) would represent an anomalous delegation of almost unbridled discretion and authority in the tariff area. The Government has invoked this section as authorizing executive abolition of a tariff, see Proc. 4210, supra, and as conveying power to impose fees which would double the revenues collected from tariffs by the United States.[13] Moreover, the number of articles potentially covered under the umbrella of "national security" is great. Under these circumstances, such a massive assertion of executive authority in an area so thoroughly occupied by Congress requires careful scrutiny on our part to ascertain the extent of the legislative delegation.
 
 B
 
 26
 The predecessor to section 1862(b) was first enacted in the Trade Agreements Extension Act of 1955, 69 Stat. 162. The problem which originally prompted the drafting of such a provision was petroleum, which was being imported in such amounts as to threaten domestic production. A voluntary program initiated by President Eisenhower in 1954 did not produce the desired reduction of imports.
 
 
 27
 Once the Senate turned to the problem, however, its inquiry was not confined to petroleum, nor was the eventual drafting of a generalized provision preordained. As the Senate Committee Report on the Trade Extension Act makes clear:
 
 
 28
 The committee had before it several proposals dealing with specific commodities, namely petroleum, fluorspar, lead, and zinc. In lieu of specific action on each of these the committee adopted an amendment which specifies that the Director of the Office of Defense Mobilization shall report to the President when he has reason to believe that imports of a commodity are entering the United States in such quantities as to threaten to impair the national security; that the President shall cause an immediate investigation to be made if he feels there is reason for such belief; and that the President, if he finds a threat to the national security exists, shall take whatever action is necessary to adjust imports to a level that will not threaten to impair the national security.
 
 
 29
 S.Rep.No.232, 84th Cong., 1st. Sess., 4 (1955), U.S.Code Cong. & Admin.News 1955, pp. 2071, 2103. Remarks on the floor bring the history of the section into clearer focus; rather than engaging in the potentially acrimonious process of selecting which commodities deserved protection under the guise of national security and establishing quotas for each, a generalized amendment was adopted. See 101 Cong.Rec. 5298 (1955) (statement of Senator Barkley); id. at 5297-98 (statements of Senators Flanders and Byrd). That the intended scope of the section was limited to direct controls is brought out in a colloquy between Senator Saltonstall and Senator Byrd, the Chairman of the Committee which produced the bill:
 
 
 30
 MR. SALTONSTALL. This is the final question I should like to address to the Senator. The problem of oil imports is taken care of in the last section of the bill. This gives the opportunity to the President to adjust imports, under restrictive conditions or quotas, after a report by the Director of Defense Mobilization, and after a separate independent investigation by the President if he believes the national security is being affected.
 
 
 31
 MR. BYRD. That is correct, except the amendment applies to all commodities; it applies not only to oil, but to all commodities.
 
 
 32
 MR. SALTONSTALL. It applies to all commodities, does it?
 
 
 33
 MR. BYRD. Yes. In other words, it puts other commodities on the same basis as agricultural commodities. It simply leaves to the President the power, in his discretion, to decide whether to impose a quota or to reduce the imports.
 
 
 34
 Id. at 5297. (emphasis supplied).
 
 
 35
 The Government points to two statements from the same 1955 Senate Floor debate as establishing that the intent behind the National Security Section was to give the President broad authority, including the power to impose license fees. Senator Bennett of Utah is quotes as saying:
 
 
 36
 As I understand the bill, the ODM will have at their command the entire scope of tariffs, quotas, restrictions, stockpiling, and any other variation of these programs in order to protect a particular industry, and to meet its particular needs.
 
 
 37
 Id. at 5588. When placed in context, however, this statement offers no support for the Government's position. It was made to point out that the Senator's home-state of Utah's protection of fluorspar would be well protected and clearly was made in reference to the entire bill and other existing laws. See, e. g., 50 U.S.C. §§ 98 et seq. (stockpiling); 19 U.S.C. §§ 1336, 1338, 1351 (tariff adjustments).
 
 
 38
 The second statement the Government offers appears more relevant. Senator Millikin, the ranking minority member of the committee which considered the bill, stated that the provision
 
 
 39
 grants to the President authority to take whatever action he deems necessary to adjust imports if they should threaten to impair the national security. He may use tariffs, quotas, import taxes, or other methods of import restriction.
 
 
 40
 101 Cong.Rec. at 5299. At first blush, this passage would directly support the Government's position; several factors, however, blur its probative value. First, the statement was made in the somewhat self-serving posture of a revelation by Senator Millikin, as representative of Colorado which was a major supplier of coal and petroleum, that it "was of considerable importance . . . that this amendment provide an adequate vehicle for assistance to (such) industries . . . (and that he was) convinced that the proposal can and will work." Id. Second is our normal reluctance to attach overriding weight to statements of individual legislators during floor debates. See, e. g., United States v. Int'l Union of United Auto., Aircraft and Agr. Implement Workers of America, 352 U.S. 567, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957); Banco Nacional de Cuba v. Farr, 383 F.2d 166 (2d Cir. 1967), cert. denied, 390 U.S. 956, 88 S.Ct. 1038, 20 L.Ed.2d 1151 (1968); compare Portland Cement Ass'n v. Ruckelshaus, 158 U.S.App.D.C. 308, 486 F.2d 375 (1973) (statement of sponsors entitled to weight). The third factor is our recognition that the Senator's statement is inconsistent with all of the other legislative history recounted above.
 
 
 41
 Plaintiffs advance the Conference Report on the 1955 Act to counter any inference drawn from Senator Millikin's statement. Referring to the provision, the Conferees stated
 
 
 42
 it is not intended to, and does not, diminish or impair any authority the President may have under other law.
 
 
 43
 Conf.Rep.No. 745, 84th Cong. 1st Sess. 6 (1955), U.S.Code Cong. & Admin.News 1955, at p. 2139. Plaintiffs argue plausibly that for that conference statement to have content, section 1862(b) cannot grant the expansive authority the Government claims. They conclude by invoking the rule that committee reports are generally accorded greater weight than individual statements by legislators. See, e. g., Housing Authority of City of Omaha, Neb. v. United States Housing Authority, 468 F.2d 1 (8th Cir. 1972), cert. denied, 410 U.S. 927, 93 S.Ct. 1360, 35 L.Ed.2d 588 (1973); American Airlines, Inc. v. CAB, 125 U.S.App.D.C. 6, 365 F.2d 939 (1966).
 
 
 44
 We find both sides' arguments probative, neither dispositive. While recognizing that sponsors' statements must be accorded weight, see e. g., National Woodwork Manufacturers Ass'n v. NLRB, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967); City of New York v. Train, 161 U.S.App.D.C. 114, 494 F.2d 1033 (1974), aff'd, 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975); Portland Cement Ass'n v. Ruckelshaus, supra, we also recognize that the statements of Senators Millikin and Byrd point in opposite directions. In light of all factors, we must conclude that the single floor statement the Government may justifiably rely upon is a woefully slender reed to support its construction of the statute.
 
 
 45
 That conclusion is buttressed by turning to the legislative history behind the Trade Expansion Act of 1962, 76 Stat. 872, the Act of which section 1862(b) is actually a part. The Government asserts that section 1862(b) was included in the revision pro forma. Govt. Br. at 15 n.2. While no mention is made in the Senate Committee Report of the section or its intended scope, S.Rep.No.2059, 87th Cong., 2d Sess. (1962), U.S.Code Cong. & Admin.News 1962, p. 3110, we believe that the intent of this Congress is indeed relevant, especially in light of another provision considered and rejected.
 
 
 46
 The Senate Finance Committee had added to the 1962 bill a proposed section 353:Notwithstanding any other provision of law, the President may, when he finds it in the National interest, proclaim with respect to any article imported into the United States
 
 
 47
 (1) the increase of any existing duty on such article to such rate as he finds necessary,
 
 
 48
 (2) the imposition of a duty on such article (if it is not otherwise subject to duty) at such rate as he finds necessary, and
 
 
 49
 (3) the imposition of such other import restrictions as he finds necessary.
 
 
 50
 108 Cong.Rec. 19875 (1962). Quite simply, the proposal explicitly gave the President the same authority he claims derives implicitly from section 1862(b). Senator Holland baldly stated that section 353 "is a very great departure from anything that the Congress has ever done before by way of granting power to the Executive in the field of trade." Id.[14] The provision passed the Senate, but was deleted in conference. Explaining its removal, Senator Byrd, Chairman of the sponsoring Senate Finance Committee stated:
 
 
 51
 Section 353 was a sword which would cut two ways: First, one problem was that there was no procedure prescribed for ascertaining the facts and second, the other problem was that the Congress did not retain the same opportunity for review as the other sections of the bill provide.
 
 
 52
 Id. at 22182.
 
 
 53
 Two conclusions, equally devastating to the Government's position, can be drawn. The fact that the proposal was introduced at all yields the inference that Congress believed that no other provision of the Act conferred that authority. See, e. g., United States v. Carter, 311 F.2d 934 (6th Cir.), cert. denied, 373 U.S. 915, 83 S.Ct. 1301, 10 L.Ed.2d 415 (1963); Fisher Flouring Mills Co. v. United States, 270 F.2d 27 (9th Cir. 1958). We also must conclude that Congress' eventual rejection of the provision indicates that it did not desire to confer this authority and discretion upon the President.
 
 
 54
 This reading of the intent of the 1962 Congress, coupled with the lack of strong evidence to the contrary concerning the 1955 Congress, mandate the conclusion that the President does not currently possess the authority to impose indirect controls. We note that recently the Customs Court reached the same conclusion regarding the legislative history behind section 1862(b). Yoshida International, Inc. v. United States, 378 F.Supp. 1155, 1166 (Cust.Ct.1974).
 
 
 55
 We have examined the cases the Government has cited to us interpreting section 1862(b) and find that none dictate an opposite conclusion. Both Texas American Asphalt Corp. v. Walker, 177 F.Supp. 315, 326 (S.D.Tex.1959) and Pancoastal Petroleum, Ltd. v. Udall, 121 U.S.App.D.C. 193, 348 F.2d 805 (1965) dealt with challenges to particular quota allocations under MOIP; both upheld the President's discretion in establishing the mechanism by which direct controls were to be administered. Neither provides any support for the proposition that section 1862(b) conveys power to impose indirect controls. In this regard, Judge McGowan's description of section 1862(b) in Consumers Union of United States, Inc. v. Kissinger, supra, 506 F.2d at 142 (emphasis supplied, footnote omitted), is particularly apropos:
 
 
 56
 action shall be taken "to adjust the imports" of the article in question, which means that the article may by regulation be excluded from entry or withdrawal from warehouse.
 
 
 57
 Finally, we have examined the present Congress' response to the President's actions. Congress passed a bill suspending for a ninety day period the imposition of the supplemental fees, which President Ford vetoed. However, we cannot interpret this conduct, obviously meant to preserve the status quo, as acquiescence to the presidential assertion of authority. Cf. Federal Maritime Commission v. DeSmedt, 366 F.2d 464 (2d Cir.), cert. denied, 385 U.S. 974, 87 S.Ct. 513, 17 L.Ed.2d 437 (1966); Brennan v. Midwestern United Life Insurance Co., 259 F.Supp. 673 (N.D.Ind.1966). As the Committee Report makes clear:
 
 
 58
 The Committee has been informed that a suit has been instituted to test the validity of the President's action. . . . The Committee does not intend that its action in reporting out H.R. 1767 . . . should affect in one way or another the determination in this suit . . . on the merits of issues relating to the scope of Presidential authority or the validity of any particular exercise of that authority under section 232(b) of the Trade Expansion Act of 1962 or any other provision of law.
 
 
 59
 Furthermore, it is not the purpose of this Act to limit, expand or otherwise alter the authority delegated to the President under Section 232 of the Trade Expansion Act of 1962, as amended. Nor is it the purpose of this Act to confirm or ratify that the President, purportedly acting under the authority of the national security provision of Section 232 of the Trade Expansion Act, as amended, either with or without public hearings, has lawfully imposed, or may lawfully impose, monetary charges, however denominated, on imports whether by Proclamation or otherwise.
 
 
 60
 S.Rep.No.94-11, 94th Cong., 1st Sess. 7 (1975). See also H.Rep.No.94-1, 94th Cong., 1st Sess. 14-15 (1975). Similarly, we do not find acquiescence in the lack of an immediate challenge to the Nixon Proclamation in light of the cushioning of its impact by the fee-free provision and the virtually immediate undercutting of the rationale behind the program before its "bite" was felt by the economic events of 1973 and 1974.
 
 C
 
 61
 The conclusion that section 1862(b) only authorizes the President to adjust imports through direct methods does not in itself necessitate invalidation of the challenged license fee program. The President has wide discretion in establishing the mechanism and administrative framework for controls. Within that framework, it would be logical and consistent with Congress' intent to permit the President to impose license fees of a magnitude to off-set the administrative costs of the allocation program. We must therefore inquire whether we may sustain the challenged program on that ground.
 
 
 62
 The President, in the material accompanying his 1975 State of Union Address, has set forth his interpretation of the distinction between a tax, tariff, and a fee:
 
 
 63
 All three are charges which can be used to produce revenue and all three have the effect of reducing demand. The differences lie in the source of authority to levy the change. A tax must be levied by Congress for the purpose of raising domestic revenue. A tariff is a charge against imports and must also be authorized by the Congress. A fee is also levied on imported material but may be set for non-revenue purposes and need not be legislated.
 
 
 64
 J.A. 213 (emphasis supplied). We cannot concur in that expansive assessment of the scope of a fee and in fact find it inconsistent with recent Supreme Court holdings in the area.
 
 
 65
 In National Cable Television Association, Inc. v. United States, supra, the Supreme Court rejected a fee purportedly justifiable on the rationale, as the face of the relevant statute 31 U.S.C. § 483a apparently authorized, that its assessment was in the public interest. The Court distinguished between a tax, which could be imposed arbitrarily and without regard for benefits bestowed, and a fee, which "is incident to a voluntary act, e. g., a request that a public agency permit (an applicant) to practice law or medicine or construct a house or run a broadcast station." 415 U.S. at 340, 94 S.Ct. at 1149. The Court found that fees must be related to the benefits they conferred, and that allowing an agency to use a public policy mandate to go beyond this limitation "carries an agency far from its customary orbit and puts it in search of revenue in the manner of an Appropriations Committee of the House."[15] Id. at 341, 94 S.Ct. at 1149; accord,
 
 
 66
 We believe that this approach is dispositive, although the character of the "fee" is different, of the claim of the legitimacy of charges imposed on imported petroleum under section 1862(b). We have already acknowledged that there could be an administrative "fee" to cover the costs of administration. What we have here, however, is a regulatory charge, laid down by the Executive for policy reasons, carried far from the "customary orbit" of a fee into broad domains of revenue. Indeed, the oil charges here involved are expected eventually to generate $4.8 billion annually, more than the entire 1974 United States Customs revenue. Although a new terminology was devised by President Nixon, and continued by President Ford, we see no logical or realistic basis of disputing the Tariff Commission's comment that "the new program is substantively a duty system."[16] Similarly we find no merit in the President's 1975 statement that any charge on imports is a fee, as distinguished from a tariff, if it is "set for non-revenue purposes." From earliest days, the tariff authority given Congress by the Constitution has been understood to apply to the "protective tariff" sponsored by Alexander Hamilton, a measure focused not on obtaining tariff revenues but on the "non-revenue purpose" of protecting domestic industry against foreign competition. With some change in meaning, the oil import charge can also be termed a "protective tariff," protective of national security in conditions of enormous domestic demand, but it is a measure for imposition only by the legislature or on delegation plainly authorized by the legislature. As for the concept of an administrative fee based on "benefit," that has nothing to do with the kind of charge before us.[17] The history of the kind of charge involved has much to do with Congressional intent to authorize executive modification, and we are clear that a charge for the privilege of importing is a tariff or duty that Congress has historically and steadfastly kept for its own determination, and that none of these carefully limited authorizations for executive change applies to the case at hand.
 
 
 67
 In sum, the President's expansive definition of a legitimate fee cannot be accepted. We must also conclude that the program instituted by Presidents Nixon and Ford cannot be upheld as a proper license fee. To consider it as such would make a travesty of the term. It is, as the district court found, a "regulatory measure" an indirect control on imports and thus outside the scope of section 1862(b).
 
 III. Conclusion
 
 68
 We think it important to describe precisely the breadth of our holding. We find that in 19 U.S.C. § 1862(b) Congress only delegated authority to the President to adjust imports to protect national security through direct mechanisms. Consequently, the two-tier program of license fees initiated by Presidents Nixon and Ford are beyond the scope of their section 1862(b) authority and cannot stand.[18] By this conclusion, we do not say that Congress cannot constitutionally delegate, accompanied by an intelligible standard, such authority to the President; we merely find that they have not done so by this statute. We reach no conclusion on any delegation issue raised by the parties. Similarly, we do not reach the procedural challenges that appellants have raised to the section 1862 investigation by defendant Simon, to the imposition of the program or to the FEA regulations.
 
 
 69
 We recognize that we are overturning an honest attempt by the President to find a solution to a difficult crisis; at stake is nothing less than our country's economic freedom and survival. We also realize that the judicial branch was accused of straightjacketing the coordinate branches of Government in their attempt to alleviate the massive economic dislocation created by another grave crisis, the Great Depression. We do not believe that any such criticism would be justifiable here. The President could have moved against this problem on a unilateral basis through direct controls. Alternatively, he could have sought, as he has, additional measures from Congress.
 
 
 70
 More fundamentally, this case raises a question about the way Government should operate when responding to crisis. Neither the term "national security" nor "emergency" is a talisman, the thaumaturgic invocation of which should, ipso facto, suspend the normal checks and balances on each branch of Government. Our laws were not established merely to be followed only when times are tranquil. If our system is to survive, we must respond to even the most difficult of problems in a manner consistent with the limitations placed upon the Congress, the President, and the Courts by our Constitution and our laws. We believe we reaffirm that basic principle today.
 
 
 71
 The judgments appealed from in Nos. 75-1281 and 75-1282 are reversed and remanded with instructions to enter appropriate relief for appellants. The regulations challenged in Nos. 75-1202 and 75-1206 are set aside.
 
 
 72
 So ordered.
 
 ROBB, Circuit Judge (dissenting):
 
 73
 The majority concludes that what the President can do directly he cannot do indirectly. On the basis of this conclusion the majority overturns what it concedes to be "an honest attempt by the President to find a solution to a difficult crisis". Since I cannot agree that the President has exceeded his delegated authority I dissent.
 
 
 74
 As amended by the Trade Act of 1974, section 232(b) of the Trade Expansion Act of 1962, 19 U.S.C.A. § 1862(b) (Supp. 1, Feb. 1975), provides that if the Secretary of the Treasury finds that an article of commerce is being imported into the United States so as to threaten to impair the national security he shall so advise the President, and
 
 
 75
 the President shall take such action, and for such time, as he deems necessary to adjust the imports of such article and its derivatives so that such imports will not threaten to impair the national security, unless the President determines that the article is not being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security.
 
 
 76
 The majority holds that under this statute Congress delegated to the President only the authority "to adjust imports to protect national security through direct mechanisms". This means, presumably, that in the interest of national security the President can use "direct mechanisms", such as quotas, to adjust imports by placing restrictions or even a complete embargo on foreign oil imports, but he cannot achieve the same result by means of indirect mechanisms, such as import license fees. I cannot find any such distinction in the statute. The statute authorizes the President to "take such action . . . as he deems necessary to adjust . . . imports", without purporting to limit in any way the kind of action available to the President. Admittedly, quotas have a direct effect on imports, whereas license fees have an indirect effect. But both affect imports, and I cannot see how the plain and broad language of section 232(b) can be read to limit the President to the use of one or the other.
 
 
 77
 The majority rests its holding on three grounds: (1) that the broad Presidential power exercised here is unprecedented in the history of foreign trade regulation; (2) that the legislative history of section 232 does not support the government's position; and (3) that two recent Supreme Court decisions militate against the government's position. As to the first ground: however guarded Congress may have been in the past in delegating to the President the power to regulate foreign commerce, section 232 is a plain delegation of broad power where national security interests are involved. As to the second, the legislative history of section 232 is hopelessly ambiguous and inconclusive. In my opinion the floor debates do not provide an adequate foundation for a restrictive reading of section 232. Finally, the two Supreme Court decisions cited by the majority deal with license fees charged by administrative agencies to recover costs incurred by them in carrying out their regulatory functions. Any similarity between such license fees and the license fees involved here is in name only. Here the license fees are imposed for the purpose of regulating foreign commerce and not to recover governmental expenses related to such regulation.
 
 
 78
 The majority is driven to its conclusion by its concern that "(i)f our system is to survive, we must respond to even the most difficult of problems in a manner consistent with the limitations placed upon the Congress, the President, and the Courts by our constitution and our laws." While I share this concern, I believe the court should not interfere in this dispute between the President and Congress. The power to regulate foreign commerce belongs to Congress, and it may delegate as much or as little as it chooses to the President. If it determines it has gone too far, Congress may withdraw the delegated power from the President. Here the delegated power is broad, and Congress has had repeated opportunities to limit it or withdraw it altogether. It has not done so, and I think this court should not do so.
 
 
 79
 As for the other issues raised by the parties, they are adequately treated in the opinion of the District Court, embodied in the court's findings of fact and conclusions of law. Since this opinion is unreported, I have set it out as an appendix to this dissent.
 
 
 
 [1]
 The term "petroleum" as used herein refers to both crude oil, unfinished oils (which encompasses a variety of refined petroleum products) and finished products
 
 
 [2]
 See United States Tariff Commission, World Oil Developments and U.S. Oil Import Policies, T.C. Publication 632 at 46-48 (1973) (hereinafter Tariff Commission Report ). Many of these modifications, especially in the period 1970-73, were necessary to meet the gap between domestic supply and demand. As such, MOIP failed to accomplish its stated objective of reducing dependence on foreign oil. See generally id. at 42-70
 
 
 [3]
 The fees were to increase during that period from 10.5 to 21 cents/bbl for crude oil, from 52 to 63 cents/bbl for motor gasoline and from 15 to 63 cents/bbl for finished products and unfinished oils. Proc. 4210 § 3(a)
 
 
 [4]
 The investigation may be commenced upon "request of the head of any department or agency, upon application of an interested party," or upon the Secretary's own motion. The Secretary must submit his recommendation for action or inaction within one year of the receipt of a request for or the start of an investigation
 
 
 [5]
 See 40 Fed.Reg. 4412-4465 (1975). Substantive responses were received from all departments except Labor who wrote that it could not conduct an appropriate investigation within the ten day time limit imposed by Secretary Simon
 
 
 [6]
 Proc. 4341 did not affect the fee-free quotas under the Nixon-imposed fees, nor the schedule for their elimination. President Ford also reinstated the tariffs on petroleum products removed in 1973, but provided that they could be offset against the supplemental fees
 On February 19, 1975, Congress passed a bill imposing a 90-day moratorium upon the implementation of Proc. 4341. H.R. 1767, 94th Cong., 1st Sess. (1975). On March 4th, President Ford vetoed the bill, but suspended the imposition of the supplemental fees for two months. See 121 Cong.Rec.H. 1403; Proc. 4355, 40 Fed.Reg. 10437 (1975). On April 30th, he continued the suspension for an additional thirty days. Proc. 4370, 40 Fed.Reg. 19421 (1975). Finally, on June 1, 1975, President Ford imposed the second dollar of the supplemental fee. Proc. 4377, 40 Fed.Reg. 23429 (1975).
 
 
 [7]
 Commonwealth of Massachusetts and Governor Michael S. Dukakis; State of Connecticut and Governor Ella Grasso; State of Maine and Governor James B. Longley; State of New Jersey and Governor Brendan T. Byrne; State of New York and Governor Hugh Carey; Commonwealth of Pennsylvania and Governor Milton J. Shapp; State of Rhode Island and Governor Philip W. Noel; and State of Vermont and Governor Thomas P. Salmon. The State of Minnesota subsequently intervened as a plaintiff
 
 
 [8]
 Algonquin SNG, Inc., New England Power Co., New Bedford Gas and Edison Light Co., Cambridge Electric Light Co., Canal Electric Co., Montaup Electric Co., the Connecticut Light and Power Co., the Hartford Electric Light Co., Western Massachusetts Electric Light Co., and Holyoke Water Co
 
 
 [9]
 Representative Robert P. Drinan, SJ
 
 
 [10]
 In response a motion by appellants, consented to by the government, the district court pursuant to Fed.R.Civ.P. 65 ordered that its conclusions, with respect to preliminary relief, constitute the court's final judgment
 
 
 [11]
 The one additional issue raised in the appeal of the implementing regulations is appellants' contention that the FEA violated the procedural provisions of the Federal Energy Administration Act, 15 U.S.C. § 761 et seq. In light of our conclusion that the President does not possess substantive power to impose the challenged fees, we do not reach this question
 C v. New England Power Co., 415 U.S. 345, 94 S.Ct. 1151, 39 L.Ed.2d 383 (1974), arguing both that authority to impose license fees may not be implied without a clear statutory directive and that the statute should be interpreted to exclude such power to avoid constituting an unconstitutional delegation.
 
 
 [12]
 Congress also mandated in this connection that the Tariff Commission was to have an advisory role in the process and that President designate an agency to conduct public hearings. 19 U.S.C. §§ 1841, 1843
 
 
 [13]
 Proc. 4341 was expected to generate $4.8 billion in annual revenues. In 1974 total revenues from all tariffs were $4.3 billion. See White House Fact Sheet at 13, J.A. 170. U.S. Customs Service, Activity Report, Fiscal Year 1974
 
 
 [14]
 Senator Holland opposed the bill. While statements of opponents normally are no authorative guide to construing the statute, see Bauers v. Heisel, 361 F.2d 581 (3rd Cir. 1966), cert. denied, 386 U.S. 1021, 87 S.C.T 1367, 18 L.Ed.2d 457 (1967), they may sometimes be useful, especially where proponents make no response. Arizona v. California, 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963). In this case, we find Senator Holland's statement relevant in light of the fact that his view eventually prevailed
 C v. New England Power Co., supra.
 
 
 [15]
 The Court also noted that an assessment is made heavy if the activity in question was to be discouraged and that the levy is "slight if a bounty is to be bestowed" but concluded that "(s)uch assessments are in the nature of 'taxes' which under our constitutional regime are traditionally levied by Congress." 415 U.S. at 341, 94 S.Ct. at 1149. Of course, assessing fees to discourage activity is the core of the challenged program
 
 
 [16]
 The President has created a new mechanism for import adjustment called a license fee. The analysis, however, suggests that what Proclamation 4210 does is substitute a duty system for the quota mechanism of the Mandatory Oil Import Program, for the license fee has the incidences of a duty. The name is new and the administration has been shifted from the Department of the Treasury (U.S.) Customs Service to the Department of the Interior. Nonetheless, the new program is substantively a duty system(.)
 Tariff Commission Report at 97.
 
 
 [17]
 While there may be a useful concept of a fee based on "benefit" the term would be grossly distorted if stretched to this case on the ground that if there were no "benefit" the importer would not pay the charge and consummate the import, for that kind of stretch would make it applicable to all tariffs and duties
 
 
 [18]
 Similarly, Section 1862(b) would not allow a President to suspend duly enacted tariffs such as President Nixon did in Proclamation 4210. Of course, President Ford reimposed the tariffs in Proclamation 4341, and no relief is now appropriate