EXXON CORPORATION, Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION
and Frank G. Zarb, Defendants,

Ashland Oil Company, Intervenor.

Civ. A. No. 75–150.

United States District Court,
D. New Jersey.

Oct. 30, 1975.

Garrett Brown, Stryker, Tams & Dill, Newark, N. J., William H. Allen, John A. Hodges, Washington, D. C., Robert L. Norris, Houston, Tex., for plaintiff.

Patricia Blair, Washington, D. C., Brett S. Harwood, Ravin & Ravin, Newark, N. J., Peter H. Rodgers, Washington, D. C., for defendants.

## OPINION

LACEY, District Judge.

The parties are before the court on motions by plaintiff for summary judgment

and by defendants for total or partial summary judgment. Plaintiff seeks a permanent injunction and a declaratory judgment that certain regulations of the Federal Energy Administration, which regulations establish a "cost equalization program," are invalid.

This court has jurisdiction of this action under § 5(a)(1) of the Emergency Petroleum Allocation Act, P.L. 93–159, 87 Stat. 627 (November 27, 1973), as extended, P.L. 93–511, 88 Stat. 1602 (December 5, 1974), which makes §§ 205–211 of the Economic Stabilization Act of 1970, as amended, P.L. 92–210, 85 Stat. 743, applicable to a regulation promulgated under § 4(a) of the EPAA.

### FINDINGS OF FACT

Plaintiff, Exxon Corporation, is a major, integrated oil company which produces, transports, refines and sells crude oil and petroleum products in the United States and abroad. Defendant, Federal Energy Administration [hereinafter FEA], is an agency and instrumentality of the United States created by the Federal Energy Administration Act of 1974, 15 U.S.C. §§ 761 *et seq.* and established by Executive Order No. 11,790 (June 27, 1974). The FEA is charged with the responsibility of administering programs established pursuant to the Emergency Petroleum Allocation Act of 1973 [hereinafter EPAA], as amended, 15 U.S.C. §§ 751 *et seq.* Frank G. Zarb is Administrator of the FEA.

Defendant-Intervenor, Ashland Oil Company, Inc., is an "independent refiner" as that term is defined in § 3(3) of the EPAA and the regulations issued thereunder.

The EPAA went into effect on November 27, 1973. Section 4(a) of the Act required the President to

promulgate a regulation providing for the mandatory allocation of crude oil, residual fuel oil, and each refined petroleum product, in amounts specified in (or determined in a manner prescribed by) and at prices specified in (or determined in a manner prescribed by) such regulation.

Those regulations were to implement "to the maximum extent practicable," the objectives set forth in § 4(b) of the Act. Section 4(b)(1) provides that:

The regulation under subsection (a) of this section, to the maximum extent practicable, shall provide for—

(D) preservation of an economically sound and competitive petroleum industry; including the priority needs to restore and foster competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry, and to preserve the competitive viability of independent refiners, small refiners, nonbranded independent marketers, and branded independent marketers;

(F) equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry, including independent refiners, small refiners, nonbranded independent marketers, branded independent marketers, and among all users;

(H) economic efficiency; and

(I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms.

"Independent refiner," as defined in § 3(3) of the EPAA, includes any refiner that obtains more than 70% of its refinery input from sources not subject to its control and which markets a substantial portion of its gasoline through independent marketers. A "small refiner" is defined in § 3(4) as any refiner whose total refinery capacity does not exceed 175,000 barrels per day.

Pursuant to the EPAA, the President established the Federal Energy Office [hereinafter FEO] and delegated to it all authority vested in the President by the EPAA. The FEA is the successor to the FEO. The FEO then adopted Mandatory Fuel Allocation Rules on December 27, 1973 which were revised on January 14, 1974. One

aspect of the FEO's initial regulatory scheme was a two-tier pricing system for crude oil which was designed to minimize as much as possible the inflationary impact of world-wide oil price increases on the United States economy. The regulations fix a ceiling price for some crude oil, while the price of other crude oil is not controlled. The FEA ceiling price applies to what is termed "old" domestic oil. "Old" domestic oil is oil that is equivalent in volume to what was produced at a property in 1972. 10 C.F.R. § 212.72. Forty percent or less of crude oil run in refineries in the United States is "old" domestic oil. Any oil produced by a property in excess of the 1972 production is "new" oil and is not subject to the ceiling price controls. In addition, there is "released" oil. Each barrel of "new" oil produced releases a barrel of "old" oil from the ceiling, and that also is not subject to the ceiling. Crude oil from certain marginal wells ("stripper wells") is exempt by statute from controls. EPAA § 4(e)(2)(A). Imported crude oil is also not subject to price controls. 10 C.F.R. § 212.53(b).

This two-tier structure, however, began to interfere with market mechanisms and have an inequitable effect upon certain American refiners. The FEA, to remedy these problems, designed its Cost Equalization Program [CEP], 39 Fed.Reg. 42246 (December 4, 1974), which is the subject of attack in this lawsuit.

Under the CEP each refiner reports for a past month its estimate of net receipts of price controlled "old" oil and its total refinery runs to stills. From these reports a national ratio of old oil receipts to refinery runs, called a national old oil ratio, is calculated. Each barrel of old oil is represented by an "entitlement." Each refiner is credited by the FEA with entitlements equal to the number of barrels resulting from the application of the national old oil ratio to its refinery runs, with an upward adjustment in the number of entitlements issued to those refiners who qualify for a "small refiner bias." Additionally, in January, 1975, a limited number of eligible firms (including refiners) who import residual fuel oil

and home heating oil (which includes no. 2–D diesel fuel) have been issued entitlements based on the volume of such product imported. (The FEA has removed importers from the coverage of the CEP by regulation effective February 1, 1975). To the extent that a refiner's estimated receipts of old oil exceeded the ratio, it must purchase additional entitlements from a refiner with excess entitlements for sale because of having less old oil in proportion to refinery runs than the average.

According to the FEA, the objective of the proposed program was "to bring the small and independent sector of the refinery industry into relative cost parity with the major refiners." 39 Fed.Reg. 31650.

Schedules of entitlements have been published two months after the month to which they apply. For example, the direction to refiners (and importers) to buy and sell entitlements related to November 1974 refinery runs was published in January 1975.

All refiners and importers who sell entitlements are required to count their proceeds on entitlements sales as a reduction in crude oil or product costs. All refiners who must buy entitlements are permitted to count the cost thereof as an addition to crude oil costs. FEA price regulations further permit these increased crude oil costs to be passed through to the ultimate consumer. It is not required that these higher costs be passed along; rather that decision is left to each refiner to make for himself.

Exxon alleges, through its brief and the affidavit of Roy Weiland (dated September 10, 1975), that Exxon has been a net buyer of entitlements to the extent of $58.4 million through August, 1975 (Supplemental Affidavit at ¶ 4) and that it has not been able to pass through, in the prices of its products, the cost of the entitlements it has had to buy. In its brief it stated:

> The reason is that there is no shortage of petroleum products, and the market has not been willing to absorb the price increases that Exxon is theoretically entitled to effect under FEA regulation. Exxon, like other refiners, has banked increased costs that the FEA regulations

permit it to use as a basis for increasing its prices. Exxon's bank of increased costs has grown during the period in which the entitlements program has been in effect. The cost of the entitlements has been a principal factor in the growth. Plaintiff's Memorandum at 9–10 (quoting Mr. Weiland's affidavit at ¶ 12).

Plaintiff through the affidavit of Mr. Weiland goes on to say that in the light of these market conditions, it is "*problematical* . . . whether the cost of entitlements can ever be recovered in the marketplace." Affidavit of June 18, 1975, at ¶ 12. Exxon seeks a judgment, as a matter of law, declaring FEA's cost equalization program invalid and enjoining its enforcement against Exxon. It also asserts that because the constitutionality of the CEP is a substantial question, the constitutional issues should be certified to the Temporary Emergency Court of Appeals. Exxon admits, however, that four other district courts have declined to preliminarily enjoin the entitlements program.

On January 31, 1975 in a memorandum opinion dictated into the record, this court denied Exxon's motion for a preliminary injunction, finding that plaintiff had not made a convincing demonstration that the passing through provision was of no practical benefit and that Exxon had been irreparably injured; that the FEA had exceeded the powers conferred by statute; that the assailed regulation was arbitrary and capricious; that a second public hearing was necessary; and that a substantial constitutional question was raised so that the issues must be certified to the Temporary Emergency Court of Appeals.

## CONCLUSIONS OF LAW

■ Section 211(d) of the Economic Stabilization Act of 1970 [ESA], provides that: no regulation of any agency exercising authority under this title shall be enjoined or set aside, in whole or in part, unless a final judgment determines that the issuance of such regulation was *in excess of the agency's authority, was arbitrary or capricious*, or was otherwise

unlawful under the criteria set forth in [5 U.S.C., § 706(2)], and no order of such agency shall be enjoined or set aside in whole or in part, unless a final judgment determines that such order is in excess of the agency's authority, or is based upon findings which are not supported by substantial evidence. (emphasis added)

The section further provides that:

A district court of the United States . . . may enjoin temporarily or permanently the application of a particular regulation or order issued under this title to a person who is a party to litigation before it.

In order to enjoin the CEP as to Exxon, then, this court must find that the regulation was issued in excess of FEA's authority, is arbitrary or capricious, was adopted without the procedure required by law, or is unsupported by substantial evidence. Exxon contends that the entitlements program is not authorized by the EPAA. While the EPAA confers temporary authority to allocate crude oil and products thought to be in short supply and to control the prices of these products, plaintiff argues that: their authority ceased when the Arab embargo ended; the authority to allocate crude oil and to specify prices does not include imposing a cost parity scheme on refiners; the CEP does not adequately provide for a dollar-for-dollar passthrough of costs.

■ Plaintiff's first contention—that the authority of the FEA ceased when the Arab embargo ceased—was dealt with negatively in *Marathon Oil Co. v. Federal Energy Administration*, Docket No. C. 75–36, at 18 (N.D.Ohio, January 31, 1975) and *Union Oil Co. v. Federal Energy Administration*, Docket No. CV 74–1943–MML (C.D.Cal., July 25, 1974). I agree with the holdings of both courts. Judge Walinski in *Marathon* relied on the court's rationale in *Union Oil* when it stated:

In contending that the Emergency Petroleum Allocation Act authorized petroleum allocation only during the period of physical shortages, the plaintiff asks the court to imply a limitation which is not

expressed in the Act but is merely to be inferred from some language in the Act. But the Act itself does not have express language dealing with the occasions in which the power to make regulations will end. . . . But Congress had some concern about the structure of the petroleum industry and of the welfare of the independent refiners at times other than the period of shortagés brought on by the Arab oil embargo. Certainly the short-ages gave impetus to the passage of the Act and provided the occasion for its passage, but the Act is not limited to the problems of physical shortages. *Consequently, the Court does not think that the end of the physical shortages spells the demise of the power to allocate petroleum.* Slip Opinion at 18 (emphasis added)

■ Plaintiff's second argument—that the CEP exceeded the FEA's authority under § 4(a) of the EPAA because the CEP did not allocate oil and imposed a cost parity system instead—was also dealt with in *Marathon.* The court felt that that rationale

seems to suggest, as the FEA points out, that the CEP cannot qualify as an allocation program simply because it does not require the physical transfer of crude oil among refiners. Such a physical transfer requirement would indeed seem to have added more administrative burdens as well as increased costs to an already burdened industry producing an already very expensive product—to say nothing of the problems for FEA. Hence, the CEP is clearly an allocation program since it achieves the same result that actual transfers of crude oil would have. Slip Opinion at 16.

*See also Cities Service Co. v. Federal Energy Administration,* Civil Action No. 75–653 (D.D.C., July 10, 1975); *Gulf Oil Co. v. Federal Energy Administration,* 391 F.Supp. 856 (W.D.Pa., 1975), *dismissed for lack of jurisdiction,* 521 F.2d 810 (Em.App. 1975). I again agree with the finding of the court in *Marathon.* The Conference Committee Report indicated that Congress intended that the President, and therefore

the FEA, have some flexibility in achieving the goals in § 4(b). It stated:

the President is to retain full authority to require allocation at the producer level on a national, regional, or case-by-case basis whenever he determines it is necessary to attain the objectives of the Act. It is expressly intended to give the President flexibility to act selectively. Accordingly, he may apply controls to large but not small producers—thus avoiding administrative complexity. 2 U.S.Code Cong. & Admin.News, 1973, at p. 2699.

Plaintiff in its reply brief analogizes this problem to that reached by the court in *Algonquin SNG, Inc. v. Federal Energy Administration,* 171 U.S.App.D.C. 113, 518 F.2d 1051 (1975). There the court ruled that the government's imposition of license fees for importation of oil and petroleum products was beyond the claimed statutory authority. The statute in *Algonquin,* 19 U.S.C. § 1862(b), authorized the President to take whatever action he thought necessary to adjust imports of a particular article and its derivatives so that they will not threaten to impair the national security. Plaintiffs alleged that the fees imposed by Presidents Nixon and Ford in certain proclamations by an indirect method exceeded their authority. The court based its decision on the fact that: a) the authority to conduct barrier reduction negotiations was delegated to the President because Congress as a body was ill-equipped to do so, but that authority, based on various other trade provisions, was "narrow and explicit in order to effectuate well-defined goals." 171 U.S.App.D.C. at 118, 518 F.2d at 1056. In view of the fact that the plan was "a massive assertion of executive authority in an area so thoroughly occupied by Congress," it required careful scrutiny; b) additionally the only legislative authority produced by the government, a statement by the sponsor of the statute in question, was inconsistent with the committee reports which are generally accorded more weight; c) a provision granting a power, similar to that the government argued it had, was later proposed in Congress; d) the Presi-

dent's expansive definition of a legitimate fee could not be accepted.

■ After careful consideration I find that the bases relied upon by the court in *Algonquin* do not apply to the case before me. Section 4(b)(1) provides the objectives for the EPAA and they cannot be described as "narrow and explicit in order to effectuate well-defined goals." Indeed any provision which has as its purpose to foster and preserve competition on any level cannot be considered narrow and explicit. The trade regulation laws certainly indicate that. Additionally, the Committee Report mentioned above states that the President was given wide latitude to attain the objectives of the provision and that he could apply controls to large producers to avoid administrative complexity. The other arguments, described in §§ b), c), and d), do not apply to the case at hand.

■ Exxon asserts that the CEP is unauthorized in that it does not provide for a dollar-for-dollar passthrough of costs as provided in § 4(b)(2). This issue was properly decided by the court in *Cities Service Co., supra*, which held that the EPAA mandates only that the FEA provide refiners with the opportunity to passthrough increased costs. Slip Opinion at 14. The CEP, 10 C.F.R. § 211.67(e)(2) and FEA refiner price regulations, 10 C.F.R. § 212.83, providing for such a passthrough, meet that requirement. Similar decisions have obtained in *Gulf Oil Co., supra* and *Exxon Corp. v. Federal Energy Administration*, 398 F.Supp. 865 (D.D.C., June 17, 1975).

I find, therefore, that the entitlements program is within the statutory authority of the FEA under the EPAA.

■ Exxon's next assertion is that the entitlements program is arbitrary and capricious based on two grounds: that the classification of refiners of "old oil" as a separate class lacks any reasonable basis in that some of the major integrated refiners are in that class; and that the CEP creates new price and cost inequities. The only issue is whether the CEP has a rational basis and not whether this court agrees

with the FEA's decision. *See Pasco, Inc. v. Federal Energy Administration*, 525 F.2d 1391 (Em.App., October 14, 1975); *Mandel v. Simon*, 493 F.2d 1239 (Em.App.1974); *Pacific Coast Meat Job Ass'n, Inc. v. Cost of Living Council*, 481 F.2d 1388 (Em.App. 1973). The court in *Marathon* also dealt with this issue and I concur with that holding:

> The mere fact that three major integrated refiners which have less than their proportionate share of old oil will be entitlement sellers, while a few small refiners will be buyers, does not make the program irrational. Rather, the program merely places the entire petroleum industry in the competitive situation that existed prior to the two-tier pricing system.

> This Court will not belabor the point. Marathon's many claims of irrationality seek to entice this Court to take on a role for which it is ill-suited. Many of Marathon's contentions on this point would require this Court very nearly to substitute its judgment for that of the very agency best equipped to deal with this nation's problems with the competition among refiners of crude oil. *See, Overton Park v. Volpe*, 401 U.S. 402, 416, [91 S.Ct. 814, 28 L.Ed.2d 136] (1971) (Court may not substitute its judgment for agency's). Finding an adequate basis in reason for the FEA's regulation, the Court will not enjoin its effectiveness as to *Marathon*. Slip Opinion at 20–21.

■ Plaintiff next contends that it has suffered and is suffering injury as a result of the CEP and this injury constitutes a taking of Exxon's property for a nonpublic purpose and without just compensation in violation of the fifth amendment. This court is without power to decide that issue (*see* § 211(c) of the ESA) although it can be certified to the Temporary Emergency Court of Appeals if the issue is found substantial. It is not substantial if it is plainly without merit or if previous Supreme Court decisions appear to foreclose the subject. *See Delaware Valley Apartment House Owners Ass'n v. United States*, 350 F.Supp. 1144 (E.D.Pa.1972), *aff'd*, 482 F.2d 1400 (Em.App.1973).

As the court in *Marathon* noted, earlier decisions of the Temporary Emergency Court of Appeals seem to indicate that this argument is without merit. *See Western States Meat Packers Ass'n v. Dunlop,* 482 F.2d 1401 (Em.App.1973); *Local Union No. 11, IBEW v. Boldt,* 481 F.2d 1392 (Em.App. 1973). This court, therefore, finds no substantial question and declines to certify such to the Temporary Emergency Court of Appeals. A similar result was reached in *Cities Service, Marathon* and *Gulf Oil.*

I find that the CEP effectuates the public purposes set forth in § 4(b)(1) of the EPAA through a fair and equitable regulatory scheme as the court in *Cities Service* likewise found. *See* Slip Opinion at 15. A reasonable and practical regulation which is generally fair and equitable, while not necessarily so as applied to a particular entity, is "not unconstitutional when general regulations are necessary to accomplish an appropriate congressional purpose." *Condor Operating Co. v. Sawhill,* 514 F.2d 351, 361 (Em.App.1975); *Bowles v. Willingham,* 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944). The program does not result in a direct appropriation of property by the government without just compensation as proscribed by the fifth amendment. *See Condor, supra ; Cities Service, supra.* Mr. Weiland's supplemental affidavit indicates, as mentioned above, that Exxon's unrecovered costs have declined during the January-June 1975 period. Theoretically it could continuously decline. The statement that it is "problematical" whether the entitlements can ever be recovered in the marketplace (Weiland affidavit at ¶ 12) at least implies uncertainty as to non-recovery. I find that at worst the effect of the CEP is a restriction on profits which is not unlawful since it results from a valid regulatory scheme. *See Western States Meat Packers Ass'n, supra* at 1404; *Local Union No. 11, supra* at 1395; *Cities Service, supra* at 15.

Based on the aforementioned reasons, plaintiff's motion for summary judgment is denied. Defendant's motion for summary judgment is granted. Plaintiff's request for certification to the Temporary Emergency Court of Appeals is denied.